**HUGHES–BECHTOL, INC., Plaintiff,**

v.

**WEST VIRGINIA BOARD OF REGENTS, Defendant.**

**No. C–3–81–038.**

United States District Court, S. D. Ohio, W. D.

Dec. 4, 1981.

---

**1368**

John O. Henry and Daina B. Van Dervort, Dayton, Ohio, for plaintiff.

Victor A. Barone, Deputy Atty. Gen., Charleston, W. Va., Daniel Lee Swigert, Dayton, Ohio, for defendant.

DECISION AND ENTRY OVERRULING PLAINTIFF'S REQUEST FOR A PRELIMINARY INJUNCTION; FINDINGS OF FACT AND CONCLUSIONS OF LAW; DECISION AND ENTRY SUSTAINING DEFENDANT'S MOTION TO DISMISS; JUDGMENT TO DEFENDANT; ENTRY OF JUDGMENT; PLAINTIFF'S MOTION TO COMPEL DISCOVERY AND SEEKING STATEMENT OF COURT'S DISINCLINATION TO SUSTAIN DEFENDANT'S MOTION TO DISMISS DEEMED MOOT; TERMINATION ENTRY

RICE, District Judge.

I. *Introduction*

On February 9, 1981, Hughes-Bechtol, Inc., filed the within action against the West Virginia Board of Regents (hereinafter Board), requesting that the Court both declare the arbitration clause in a contract between the Plaintiff and Defendant to be binding on the parties, and that it award damages in the amount established by the arbitrator. The facts before this Court indicate that on April 5, 1979, Hughes-Bechtol and the Board entered into a standard American Institute of Architects (AIA) agreement, which provided that Hughes-Bechtol would perform mechanical work on the Multi-Purpose Physical Education Facility (gymnasium) to be constructed at Marshall University in Huntington, West Virginia. The contract between the parties also provided for arbitration in the event of contractual disputes. Problems arose during construction, and Hughes-Bechtol requested arbitration. The Board refused to participate in arbitration proceedings, claiming that the arbitration clause was of no effect, since the Board had no authority to obligate the State of West Virginia for amounts beyond those which had been appropriated by the state legislature. Moreover, since the Board was immune from suit

under principles of sovereign immunity, the Board contended that Hughes-Bechtol's only, and proper remedy lay in the West Virginia Court of Claims, where suits against the state were allowed to be brought. Hughes-Bechtol proceeded through arbitration anyway, and just prior to the granting of the arbitration award, filed the present action. The Board then filed a Motion to Dismiss, requesting that the suit be dismissed, *inter alia*, for the aforementioned reasons. However, before the Court issued a ruling on Defendant's Motion to Dismiss, Hughes-Bechtol filed a Motion for a Preliminary Injunction on August 4, 1981, requesting that the Court enjoin the Board from interfering with its (Hughes-Bechtol's) contractual rights, and from its performing the work left unfinished under the contract entered into by the parties. Appropriate Opposing and Reply Memoranda were filed by the parties, and on August 11, 1981, Plaintiff's Motion for a Preliminary Injunction came on for hearing before the Court, at which time the Court received testimony on behalf of the Plaintiff, from Philip Thompson, the Regional Director of the Cincinnati Office of the American Arbitration Association, and from D.R. Hughes, Jr., the President of Hughes-Bechtol, Inc. Plaintiff also offered nine exhibits, which were admitted into evidence. Defendant offered testimony from Karl Egnatoff, the Vice-President of Administration for Marshall University, and from Kenneth E. Grose, the Vice-Chancellor for Administrative Affairs for the West Virginia Board of Regents. Defendant additionally has filed with the Court, in conjunction with its Motion to Dismiss, the Affidavit of Dr. Robert Ramsey, Jr., the Chancellor and Chief Administrative Officer for the West Virginia Board of Regents, to which is attached the purchase order issued to Hughes-Bechtol by the Commissioner of Finance and Administration for the West Virginia Board of Regents.

After consideration of the above materials, the Court indicated to the parties on August 13, 1981, that it would overrule the Plaintiff's Motion for a Preliminary Injunction, and would thereafter file a decision more fully outlining its reasoning. The Court also stated that a decision would be forthcoming at the same time with regard to the Motion to Dismiss previously filed by the Defendant. After an analysis of the facts and legal authority pertinent to the matters under consideration, the Court has concluded that: (1) Under the balancing test followed by the Sixth Circuit in *Roth v. Bank of the Commonwealth*, 583 F.2d 527 (6th Cir. 1978), *cert. dism'd.*, 442 U.S. 925, 99 S.Ct. 2852, 61 L.Ed.2d 292 (1979) (*Roth*), for ruling upon a motion for preliminary injunction, the Plaintiff has not demonstrated either a likelihood of success on the merits, or that it will suffer irreparable harm; (2) Defendant's Motion to Dismiss should be granted, since the Court does not have jurisdiction over the subject matter involved in this action. Because Fed.R. Civ.P. 52(a) requires specific findings of fact and conclusions of law by the Court upon refusal of interlocutory injunctions, the Court will first set forth its determinations with respect to the injunction request, and will then follow with an analysis of the other matters brought forth in the Defendant's Motion to Dismiss.

## II. *Preliminary Injunction*

### A. *Findings of Fact*

Based on the testimony adduced at the hearing held on August 11, 1981, and the Exhibits, affidavit, and the pleadings presented herein, the Court makes the following findings of fact:

1. Hughes-Bechtol, Inc. (also "contractor") is a corporation organized under the laws of the State of Ohio, with a principal place of business in Ohio, and an annual volume of business of approximately thirty million dollars ($30,000,000).

2. Marshall University is a state university located in Huntington, West Virginia. Marshall University has an enrollment of approximately twelve thousand students, and participates in Division I athletics.

3. In 1979, the West Virginia Board of Regents (also "owner") solicited bids in connection with the construction at Marshall

University of Henderson Center, which was intended to be a multipurpose physical education facility including a basketball arena seating ten thousand persons, classrooms for the department of health and physical education, and offices for the athletic department. Also included in this project was the renovation of an existing building, Gullickson Hall.

4. Hughes-Bechtol was awarded a contract in the amount of three million, one hundred sixty two thousand, one hundred and seventy-three dollars ($3,162,173.00) for the mechanical work for the Multi-Purpose Physical Education Facility. According to the terms of the contract, the work to be performed was to be commenced upon the date specified in the "Notice to Proceed" given by the Board to Hughes-Bechtol. From the time specified, Hughes-Bechtol would have eight hundred and fifty (850) consecutive calendar days to fully complete the project.

5. On April 5, 1979, a purchase order was issued by the State of West Virginia, Department of Finance and Administration for the above contract price.

6. The original anticipated completion date for the Henderson Center Project was April 6, 1981, but at the time of the injunction hearing, the physical activities center was scheduled for occupancy on October 15, 1981, due to delays in the project. At the time of the hearing herein, the project was ninety percent (90%) finished.

7. During the first year of the contract, little progress was made on the construction project. Hughes-Bechtol requested an extension of time and payments for the increased costs due to the delay, but the Board refused, and instead directed that Hughes-Bechtol perform the unfinished work in the time remaining under the contract.

8. Paragraph 7.9.1 of the contract between the Board and Hughes-Bechtol provided that all disputes arising between the owner and the contractor would "be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association," that the

agreement to arbitrate "shall be specifically enforceable under the prevailing arbitration law," and that "the award entered by the arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof."

9. On December 11, 1980, Hughes-Bechtol filed a demand for arbitration with the Cincinnati office of the American Arbitration Association. The arbitration inquiry was bifurcated, with consideration being first given to whether the issue was one subject to arbitration. On February 20, 1981, the arbitrator ruled that the matter was arbitrable, and notified the parties of his decision. A hearing on the claims of Hughes-Bechtol was held, and on June 9, 1981, after the filing of the within lawsuit, the arbitrator issued his decision, finding that Hughes-Bechtol was entitled to an additional sum of five hundred twenty-one thousand three hundred twenty-six dollars and forty-eight cents ($521,326.48).

10. The Board did not participate directly in the arbitration hearings, but did have a legal representative present. On various occasions, the Board and the West Virginia Attorney General's Office advised Hughes-Bechtol and the American Arbitration Association that the Board of Regents was not authorized to engage in binding arbitration.

11. Paragraph 9.7 of the contract provided that if an amount awarded through arbitration was not paid by the owner, the contractor was permitted to stop work. After the Board refused payment of the arbitration award, Hughes-Bechtol removed its work forces from the Henderson Center construction site on July 20, 1981.

12. The other contractors on the Henderson Center project have agreed to pursue remedies for contractual claims against the Board in the West Virginia Court of Claims.

13. Vandalism at the University is minimal. The only incidents testified to involved minor tampering with fire equipment in the dormitories on two occasions. In addition, Henderson Center was evacuat-

ed once due to a bomb scare. Bomb scares, however, occur with some frequency at the University, because of the erroneous belief by students that such a scare will result in the cancellation of classes.

14. The Board and Hughes-Bechtol continued to attempt to negotiate, but on August 3, or 4, 1981, Hughes-Bechtol was advised that it would not be possible for Marshall University to pay seven or eight hundred thousand dollars in additional claims on the Henderson Center project.

15. On Tuesday, August 4, 1981, Hughes-Bechtol removed approximately two hundred thousand dollars ($200,000.00) worth of equipment from the Henderson Center job site, and from warehouses in Huntington, West Virginia. Between July 20, 1981, and the date of the equipment removal, Hughes-Bechtol had employed a project manager on the job site. Although the equipment had been at the job site or in warehouses for at least one year, Hughes-Bechtol was concerned about the safety of the equipment, based on the bomb scares at the job site and the possibility of vandalism at both the job site and the warehouses. Hiring a twenty-hour guard for the property may have been less expensive than moving the equipment to Dayton. Hughes-Bechtol did not attempt to find other warehouses in the Huntington area to accommodate the property.

16. Hughes-Bechtol's sole claimed damage justifying a preliminary injunction is that, on future bids, it will be required to disclose on the bidding qualification statement that it had failed to finish work awarded to it. This would preclude Hughes-Bechtol from being considered for a bid by some employers. The bidding qualification statement also provides for an explanation of why the work awarded was not finished.

17. If a preliminary injunction should be granted, the University would be unable to start its basketball season and intramural programs as scheduled. Approximately five thousand tickets have already been sold for the first game of the season. In addition, an injunction would have an effect on

the academic program of the University. Since the new facility is constructed so as to "wrap around" an existing structure, classrooms already in existence will be unavailable because of poor ventilation. Finally, an injunction would cause the loss of the jobs of the approximately one hundred and thirty other construction employees presently working at the Henderson Center site.

18. Payments for the Henderson Center project come from the State treasury of West Virginia. The project was financed by a public bond sale, with student revenues for future years obligated to pay for the project. All funds expended by the Board of Regents are state funds from the state treasury and may only be spent pursuant to an appropriation by the West Virginia legislature. All funds received by the Board from all other sources such as federal funds or gifts must be deposited in the state treasury and may be expended only for their specified purposes, and after appropriation by the West Virginia legislature.

19. If Hughes-Bechtol does not complete its contractual obligations, the Board intends to secure other contractors to perform the work.

20. The State of West Virginia has authorized suit to be brought against the State in the West Virginia Court of Claims.

### B. Conclusions of Law

In *Roth*, 583 F.2d 527 (6th Cir. 1978), *cert. dism'd.*, 442 U.S. 925, 99 S.Ct. 2852, 61 L.Ed.2d 292 (1979), the Sixth Circuit indicated that the following approach should be utilized in determining whether injunctive relief should be granted:

In addition to assessing the likelihood of success on the merits, the Court must consider the irreparability of any harm to the plaintiff, the balance of injury as between the parties, and the impact of the ruling on the public interest.

*Id.* at 537–538, quoting with approval from, *Metropolitan Detroit Plumbing & Mechanical Contractors Ass'n v. H.E.W.*, 418 F.Supp. 585, 586 (E.D.Mich.1976) (*Detroit Plumbing v. H.E.W.*). While there has been

an ostensible conflict in the Sixth Circuit's interpretation of precisely what degree of likelihood of success is required, *compare: Ohio v. Callaway*, 497 F.2d 1235, 1240 (6th Cir. 1974) (requiring possibility of success on the merits), with *Mason County Medical Ass'n v. Knebel*, 563 F.2d 256, 261, n.4 (6th Cir. 1977) (requiring strong or substantial likelihood or probability of success on the merits), the *Roth* Court approved the following explanation, again quoting *Detroit Plumbing v. H.E.W.*, 418 F.Supp. 585, 586 (E.D.Mich.1976):

> This apparent disparity in the wording of the standard merely reflects the circumstance that no single factor is determinative as to the appropriateness of equitable relief ... In general, the likelihood of success that need be shown will vary inversely with the degree of injury the plaintiff will suffer absent an injunction ... [i.e., the greater the potential harm to the plaintiff, absent an injunction, the less likelihood of success on the merits which need be shown, and vice-versa]. It thus appears that the precise wording of the standard for the likelihood of success on the merits is not as important as a realistic appraisal of all the traditional factors weighed by a Court of equity. A balancing is required, and not the mechanical application of a certain form of words.

*Roth*, 583 F.2d at 537–538. (Bracketed material added).

■ Balancing the above factors then, as required, this Court finds that injunctive relief is not appropriate under the circumstances involved herein. First, there appears to be slight likelihood that Plaintiff will be able to prevail on the merits in this Court. In reaching such a determination, the Court has carefully avoided any prediction with regard to the eventual outcome of the controversy between Hughes-Bechtol and the Board, but instead has premised its decision on the fact that this Court has no jurisdiction over the subject matter of the present dispute. Consequently, Plaintiff will never be able to succeed in obtaining a judgment on the merits in this jurisdiction. Second, assuming that Plaintiff could somehow "prevail" herein, it has not demonstrated that it will sustain irreparable harm without the issuance of an injunction. Although Plaintiff has indicated that it will be harmed in its ability to bid on future construction contracts if it does not finish the Marshall University contract, an examination of the bidding qualification statement relied upon by Plaintiff indicates that an opportunity is provided thereon for an explanation of the circumstances surrounding any failure to complete a contract. Thus, should Plaintiff eventually receive an award from the West Virginia Court of Claims, which would vindicate its refusal to complete the contract, that fact alone should provide ample justification for future employers. Therefore, Plaintiff does have an adequate remedy at law. Moreover, even at the present incomplete stage of the proceedings, Hughes-Bechtol does have a favorable arbitral decision which may be used as an explanation for the work stoppage at Marshall University, or for a refusal to finish the contract.

Third, the balance of injury in the event of issuance of an injunction, clearly rests with the Board rather than with Hughes-Bechtol. Since the Board is charged by law with the supervision and management of the educational policies and affairs of the universities of West Virginia, W.Va.Code § 18–26–1 (1969), an interference with the intramural, athletic, and educational programs at Marshall University would negatively affect the Board's ability to perform its legislatively-mandated functions. Finally, assuming *arguendo* that all the above considerations militated in favor of Hughes-Bechtol, the impact of a ruling permitting an injunction would adversely serve the public interest of the people of West Virginia, who would be deprived indefinitely of their ability to utilize the Henderson Center Facility, and would be subjected to a disruption in educational opportunities.

Therefore, based on the foregoing analysis, the Court makes the following conclusions of law:

1. Plaintiff has little or no likelihood of succeeding on the merits in the present action;

2. Plaintiff has not demonstrated that it does not have an adequate remedy at law, or that it would suffer irreparable harm absent an injunction;

3. The balance of harm in the event of an injunction is in favor of the Board of Regents rather than Plaintiff;

4. Plaintiff has not established that the issuance of a preliminary order restraining construction at Henderson Center, or enjoining Defendant from employing another mechanical contractor, will not injure the public interest.

Accordingly, Plaintiff's request for a preliminary injunction must be, in all respects, denied.

### III. *Motion to Dismiss*

As was previously indicated, Defendant filed a Motion to Dismiss on April 2, 1981, requesting that the within action be dismissed under Fed.R. of Civ.P. 12(b)(1), (2), (3), (5), (6), and (7). While Defendant has raised several grounds for dismissal such as insufficiency of process, failure to join an indispensable party, sovereign immunity, and lack of subject matter jurisdiction, only two grounds for Defendant's Motion need be addressed, as those matters provide more than ample justification for dismissing this action. Therefore, the Court will discuss only those issues contained in branches I and II of Defendant's Motion to Dismiss, that is, those matters pertinent to subject matter jurisdiction and sovereign immunity. For procedural clarity, this Court will first consider the jurisdictional questions presented in Branch II of Defendant's Motion. With these points in mind, the Court now turns to an analysis of: (1) whether diversity jurisdiction exists between the Plaintiff and Defendant, and if not, whether an alternate source of federal jurisdiction is present; and (2) whether in any event, suit against the Board of Regents is prohibited under the doctrine of sovereign immunity.

### A. *Jurisdiction*

#### 1. *Diversity of Citizenship*

The complaint filed in this action states that the Plaintiff, Hughes-Bechtol, Inc., is a corporation organized under the laws of Ohio, that the Defendant, the West Virginia Board of Regents, is a citizen of the State of West Virginia, that the amount in controversy exceeds ten thousand dollars, and that jurisdiction exists pursuant to 28 U.S.C. § 1332 (1970). § 1332 provides that:

> The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and is between—(1) citizens of different states.

Although the parties herein are technically "residents" of different states and would thus seem to satisfy diversity requirements, Defendant has maintained that the Board is merely the arm, or alter ego, of the State of West Virginia and cannot therefore be considered a citizen for diversity purposes. Plaintiff has replied to this contention by pointing out that under West Virginia law, the Board is a corporation, and was subjected to diversity jurisdiction in *Kondos v. West Virginia Board of Regents*, 318 F.Supp. 394 (S.D.W.Va.1970), aff'd, 441 F.2d 1172 (4th Cir. 1971) (*Kondos*).

■ The principle is well settled that a state may not be considered a citizen in order to establish diversity jurisdiction. In *Postal Telegraph Cable Co. v. Alabama*, 155 U.S. 482, 15 S.Ct. 192, 39 L.Ed. 231 (1894) (*Postal Telegraph*), the State of Alabama had initiated suit in an Alabama state court against a New York corporation in order to recover taxes owed to the State. *Id.* at 482, 483, 15 S.Ct. at 192, 193. The Defendant removed the case to federal court, but the Supreme Court ruled that removal was improper, since neither diversity nor federal jurisdiction was present. *Id.* at 487, 15 S.Ct. at 194. With respect to diversity, the Court stated that:

> A state is not a citizen. And, under the Judiciary Acts of the United States, it is

well settled that a suit between a State and a citizen or a corporation of another State is not between citizens of different States; and that the Circuit Court of the United States has no jurisdiction of it unless it arises under the Constitution, laws or treaties of the United States.

*Id.* (citations omitted).

In *State Highway Comm'n of Wyoming v. Utah Constr. Co.*, 278 U.S. 194, 49 S.Ct. 104, 73 L.Ed. 262 (1929) (*Wyoming Highway Comm'n*), a Utah citizen filed a breach of contract action against the Wyoming State Highway Commission in a Wyoming district court, alleging jurisdiction on the basis of diversity of citizenship. *Id.* at 198, 49 S.Ct. at 105. Although the State of Wyoming had not been named as a party to the action, the Court held that since the suit was in effect against the State, diversity of citizenship could not exist. *Id.* at 199–200, 49 S.Ct. at 105–106. The Court appeared to premise its determination that the State was the real party in interest on the following factors: (1) the highway commission was merely an arm or alter ego of the state, "with no funds or ability to respond in damages," *id.* at 199, 49 S.Ct. at 106; and (2) neither the Highway Commission nor its members had assumed any direct or personal responsibility by entering into the contract in question. *Id.* Significantly, the Court found it unnecessary to consider the effect of the State's grant to the Highway Commission of the power to sue or be sued, or its later withdrawal of that power. *Id.* The Court indicated that since the State was not considered to be a citizen for purposes of diversity, "[N]o consent by the State to submit itself to suit could affect the question of diverse citizenship." *Id.* at 199–200, 49 S.Ct. at 105–106. Thus, even should a state consent to suit in federal court, that act itself cannot create diversity jurisdiction.

Like the Highway Commission in the previously cited case, the Board of Regents is a statutorily-created creature. W.Va.Code § 18–26–1 (1969) specifically provides that:

The purpose of the legislature in the enactment of this article is to establish a state agency to be known as the West Virginia Board of Regents which will have the general determination, control, supervision and management of the financial, business and educational policies and affairs of all State Colleges and Universities.

(emphasis added). Moreover, an examination of West Virginia law reveals that the board has no funds or ability to respond in damages but is merely a conduit through which budget requests from the state universities, and corresponding appropriations from the West Virginia legislature, flow. For example, W.Va.Code § 18–26–8 (1981) lists certain duties of the Board, which involve, *inter alia*: (1) directing the preparation of budget requests for state universities; (2) the submission of budget requests and analysis of requests to the legislature; (3) compilation of an annual report indicating the fiscal performance of the state system of higher education. Although some of these duties were more specifically delineated by the amendment of § 18–26–8 in 1981, the essential nature of the Board's function has not changed from former practice. *See* former W.Va.Code § 18–26–8 (1969).

Plaintiff has indicated, in a memorandum filed after the injunction hearing (doc. # 20), that the source of a state agency's funds is often determinative of that agency's entitlement to immunity from suit. Plaintiff argues therefore that since the project in question was financed by a self-liquidating bond issue secured by student tuition fees, rather than by general state revenues, the Board may not claim immunity as an arm of the State. The case cited by Plaintiff, *Hope Natural Gas Co. v. West Vir. Turnpike Comm'n*, 143 W.Va. 913, 105 S.E.2d 630 (1958) (*Hope Natural Gas*), considered whether the West Virginia Turnpike Commission was immune from suit as the alter ego of the State of West Virginia. *Id.* at 926, 105 S.E.2d 638. The Court analyzed the statutory provisions creating the Commission, which was authorized to collect tolls without supervision by other State agencies, *id.* at 919, 105 S.E.2d 634; was permitted to construct projects and to issue

revenue bonds payable solely from commission revenues, *id.* at 918, 105 S.E.2d 633; and was required under § 15 of its enabling statute to pay compensation from Commission funds for all damages caused to private property. *Id.* at 920–921, 930, 105 S.E.2d 634, 639. The Court noted that previous state and federal decisions had denied immunity to the Commission, *id.,* and further found that in any event, § 15 operated as a waiver of the Commission's immunity. *Id.* at 930, 105 S.E.2d 639–640. While the Court did place emphasis on the factor of an agency's independent financial existence, even where that agency performed a governmental function, *id.* at 924–925, 105 S.E.2d 636–637, the Court also stated that:

> In determining whether a commission or other body or entity created by the state is in truth and effect a part of the state, all of the features or characteristics must be considered and consequently each case must rest upon the provisions of the entity's own creation.

*Id.* at 928–929, 105 S.E.2d 639.

The case upon which Plaintiff has relied, however, is not controlling upon this action, due to the subsequent decision of the same court in *City of Morgantown v. Ducker,* 153 W.Va. 121, 168 S.E.2d 298 (1969) (*Morgantown*). In *Morgantown,* West Virginia's highest court considered whether to issue a writ of mandamus requiring the West Virginia Court of Claims to assume jurisdiction of an action for the collection of fire protection fees, brought against the Board of Governors of West Virginia University. *Id.* at 122, 168 S.E.2d 299–300. The Court determined that the Board was a state agency, and an arm of the State, and ordered that the writ be issued. *Id.* at 131–132, 168 S.E.2d 304. In so ruling, the Court distinguished *Hope Natural Gas* as follows:

> The rights and powers conferred and the duties imposed by the respective statutes upon the board of Governors of West Virginia University and the West Virginia Turnpike Commission differ materially and in many respects, particularly with reference to funds and moneys used and administered by the board and by the commission. The moneys accepted and received by the board of governors and on which it depends for its financial support are paid into the State treasury, whereas the moneys accepted and received by the commission are not required to be deposited in the State treasury but are administered under the supervision of the commission.

*Id.* at 131, 168 S.E.2d 304.

After the *Morgantown* decision, the West Virginia legislature amended the West Virginia Code to create the West Virginia Board of Regents, which was vested with the powers previously held by the board of governors of West Virginia University, W.Va.Code § 18–26–11 (1969), and those formerly held by the West Virginia Board of Education, W.Va.Code § 18–26–12 (1969). In 1972, after these amendments were adopted, the West Virginia Supreme Court, citing *Morgantown,* ruled that the West Virginia Board of Regents, *as an arm of the state of West Virginia,* had the authority to acquire land by condemnation without special legislative authority. *West Virginia Board of Regents v. Fairmont, Morgantown, and Pittsburgh R.R. Co.,* 155 W.Va. 863, 866–867, 189 S.E.2d 40, 43 (1972) (emphasis added). These decisions indicate that, in the opinion of West Virginia's highest state court, the Board of Regents is an arm, or alter ego, of the State of West Virginia.

■ As a final matter, this Court notes that in *Kondos,* 318 F.Supp. 394 (S.D.W.Va. 1970), aff'd 441 F.2d 1172 (4th Cir. 1971), a West Virginia district court conducted a thorough survey of the applicable West Virginia Supreme Court decisions, many of which have been cited herein, and concluded that the West Virginia Board of Regents, as an arm of the State of West Virginia, was immune from suit under the doctrine of sovereign immunity. *Id.* at 396–397. That decision was upheld on appeal by the Fourth Circuit as "proper for the reasons stated by the District Judge." 441 F.2d at 1172. Plaintiff has, however, attempted to distinguish the *Kondos* decision on several grounds, none of which are legally correct.

For example, Plaintiff has contended that diversity jurisdiction was permitted in *Kondos*, and should therefore be found to exist herein by this Court. (Doc. # 10, p. 2). While *Kondos* was filed as a diversity action, 318 F.Supp. at 396, that does not mean that the requirements for diversity jurisdiction were found to be satisfied therein; the *Kondos* Court merely dismissed the action against the Board on the alternative ground of sovereign immunity. In this context, it must be emphasized that a resolution of *either* issue requires a threshold determination of whether the agency in question is but an alter ego, or arm of the State. *Id.; Postal Telegraph*, 155 U.S. 482, 15 S.Ct. 192, 39 L.Ed. 231 (1894); *Wyoming Highway Comm'n*, 278 U.S. 194, 199–200, 49 S.Ct. 104, 105–106, 73 L.Ed. 262 (1929). Thus, the *Kondos* case cannot be viewed as supporting a finding that diversity jurisdiction is present herein, since the same considerations involved in the dismissal therein due to sovereign immunity lead this Court to conclude that the Board of Regents, as an arm or alter ego of the State, cannot be considered a citizen for diversity purposes.

The preceding discussion has illustrated that the highest courts of West Virginia, both federal and state, have spoken unequivocally and affirmatively on the issue of whether the Board of Regents is an arm of the state. Accordingly, this Court need inquire no further, beyond commenting, in response to Plaintiff's "funding source" argument, that the material distinction noted in *Morgantown*, 153 W.Va. 121, 168 S.E.2d 298 (1969), of payment of funds into the State treasury, *id.* at 131, 168 S.E.2d 304, still exists herein, whether the Henderson Center project was financed by a bond issue secured by student tuition fees, or by general state revenues. In either event, tuition fees and other funds collected by the University are required to be deposited into the State treasury. In this context, see: W.Va. Code § 18–24–1 (1981) (authorizing the Board to fix tuition and fees for state universities); §§ 18–23–5, 18–23–7 (1969) (requiring that all money belonging to the state, and coming into the hands of the governing boards of state universities be transmitted into the state treasury, with expenditure therefrom permitted only upon submission of requisitions by the governing boards, and appropriation by the state legislature).

█ Plaintiff has repeatedly asserted that the inquiry into the Board's status and conduct is a "fact-specific" one (Doc. # 8, p. 9; Doc. # 20, p. 2), and that therefore, at the present stage of the proceedings, the matters under consideration by the Court are not ripe for determination.[1] Initially,

---

1. Plaintiff has once more raised this issue in a Motion to Compel Discovery, filed on November 3, 1981. In the Memorandum accompanying that Motion, Plaintiff has cited the case of *Soni v. Board of Trustees of the University of Tennessee*, 513 F.2d 347 (6th Cir. 1975), *cert. denied*, 426 U.S. 919, 96 S.Ct. 2623, 49 L.Ed.2d 372 (1976) (*Soni*), as support for the theory that the Plaintiff must be permitted to conduct an inquiry into the factual circumstances surrounding the transaction in question herein. However, the Court does not feel that the *Soni* decision requires allowance of such an inquiry, for several reasons. First, and most important, the legal situation presented in *Soni* was fundamentally different from that of the present case. In *Soni*, the Court noted that it had "been unable to find any case discussing the University's status under the Eleventh Amendment." *Id.* at 352. The Court then stated that:

> We are uncertain whether the University of Tennessee is a state instrumentality protected by the eleventh amendment. The record before us contains little data on the University's financial relationship with the State of Tennessee, *and the Tennessee cases and statutory materials do not compel a conclusion one way or the other.*

*Id.* at 352. In the present case, as is more fully set forth in the body of this Opinion, the state and federal courts of West Virginia have in this Court's view, indicated unequivocally that the Eleventh Amendment immunity of the State of West Virginia extends to the West Virginia Board of Regents. Therefore, this Court concludes that the factors which prompted the decision in *Soni* are simply not found herein, and that consequently, no factual inquiry is necessary.

Second, assuming *arguendo* that the *Soni* decision is applicable to this case, there are several reasons why a factual inquiry is still not in order. Merely because the Sixth Circuit stated that each state university "must be considered on the basis of its own peculiar circumstances," *id.*, the conclusion does not automatically follow that the inquiry involved must be factual. When the Court in *Soni* made the foregoing

the Court notes that summary judgment is not required herein because reference to the complaint and the previously cited case law, of which the Court can take judicial notice, obviates the need for factual determinations. Moreover, even assuming the application herein of *Hope Natural Gas*, 143 W.Va. 913, 105 S.E.2d 630 (1958), the inquiry required by that case is not factual, but is one into the legislative provisions which have created the agency in question. *Id.* at 928–929, 105 S.E.2d 639. Because an analysis of the statutes creating the Board has been conducted herein (although not strictly necessary in view of the dispositive rulings of the West Virginia courts), and has revealed that the Board is an arm of the State of West Virginia, this Court can find no further barriers to concluding that the Board of Regents may not be considered a citizen for the purpose of invoking diversity jurisdiction. Having determined then, that jurisdiction herein may not be premised upon diversity of citizenship, the Court will next consider what alternate jurisdictional grounds, if any, may be present.

### 2. Other Jurisdictional Grounds

 Although diversity jurisdiction does not exist herein, *Postal Telegraph*, 155 U.S. 482, 15 S.Ct. 192, 39 L.Ed. 231 (1894), would still permit this Court to assume jurisdiction over the present action if an alternate basis of jurisdiction, such as federal question jurisdiction, exists. *Id.* at 487, 15 S.Ct. at 194. Although the complaint herein alleges that a federal question has arisen under the Eleventh Amendment, the sole Eleventh Amendment issue which has been presented is whether the Plaintiff's claim against the Board is barred under the doctrine of sovereign immunity. This issue is merely an anticipation of a defense and does not constitute an element of Plaintiff's claim, which is for a declaratory judgment and for the enforcement of an arbitration decision. As such, the Eleventh Amendment issue does not invoke this Court's federal question jurisdiction in light of the Supreme Court's ruling in *Phillips Petroleum Co. v. Texaco, Inc.*, 415 U.S. 125, 94 S.Ct. 1002, 39 L.Ed.2d 209 (1974), wherein the Court stated that:

> This Court has repeatedly held that, in order for a claim to arise "under the Constitution, laws, or treaties of the United States," "a right or immunity created by the Constitution or laws of the United States must be an element, and an essential one, of the Plaintiff's cause of action." ... The federal questions "must be disclosed upon the face of the complaint, unaided by the answer." Moreover, "the complaint itself will not avail as a basis of jurisdiction insofar as it goes beyond a statement of the plain-

statement, it was referring to the importance of the *governmental context* of each state university. In particular, the Court noted that the Tennessee State Constitution did not grant immunity to Tennessee University, while in some other cases wherein immunity had been found to exist, the University in question had been granted immunity by a specific provision of the state constitution. *Id.* In the present case, this Court has conducted an examination into the governmental context of the Board by reviewing the West Virginia statutes which create and define the Board's status and responsibilities, and has concluded that under the law of West Virginia, the Board of Regents would not be subject to suit on the basis of the activities involved herein. Moreover, as was noted in the main text of this Opinion, such an analysis was not required in view of the dispositive rulings of the West Virginia state and federal courts, but was nevertheless conducted, in order to provide the most thorough foundation for this Court's conclusions.

Having concluded then, that *Soni* does not mandate an analysis dissimilar to that which has been previously employed herein, the Court therefore finds that there is no need to further postpone the resolution of this matter in order to permit Plaintiff to inquire into the factual circumstances surrounding the Board's conduct. Accordingly, the Court must deny Plaintiff's Alternative Motion for a Statement of the Court's Disinclination to Sustain Defendant's Motion to Dismiss, as well as Plaintiff's Motion to Compel Discovery, since that Motion has been rendered moot by the Court's disposition of Defendant's Motion to Dismiss. Further, even if Plaintiff's Motion had been well taken, the Court would not have been inclined to award Plaintiff expenses under Fed.R.Civ.P. 37(a). In light of the Court's announcement in August, 1981, that it intended to grant Defendant's Motion to Dismiss, the Defendant's refusal to engage in further discovery was not without substantial justification.

tiff's cause of action and anticipates or replies to a probable defense."

*Id.* at 127–128, 94 S.Ct. at 1003–1004. (citations omitted). Consequently, as Plaintiff's assertion of an Eleventh Amendment issue does nothing more than anticipate the sovereign immunity defense which has in fact been raised by Defendant, no federal question jurisdiction has been invoked by the inclusion of that issue in Plaintiff's complaint. In addition, although Plaintiff's complaint requests a Declaratory Judgment, under 28 U.S.C. § 2201 (1958) and Fed.R.Civ.P. 57, of the legal relations between the parties, the Declaratory Judgment Act does not extend the jurisdiction of the federal courts, but is a procedural remedy which can only be afforded where another basis of jurisdiction already exists. *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671, 70 S.Ct. 876, 878, 94 L.Ed. 1194 (1950).

Finally while the potential application herein of the United States Arbitration Act, 9 U.S.C. §§ 1 et seq. (1970) has not been raised by Plaintiff's Complaint, the relevance of that Act has been discussed by both parties in various memoranda submitted to the Court. Therefore, the Court will assume that Plaintiff would, if offered an opportunity, amend its Complaint to allege the application of the United States Arbitration Act. In addition, the Court assumes, for purposes of ruling on this motion, that the contract herein involved interstate commerce, as the Act only extends to such contracts. 9 U.S.C. §§ 1, 2 (1970).

As was previously noted herein, in order for federal question jurisdiction to be present, the right or immunity involved must be created by the Constitution or laws of the United States, and must be an essential element of the Plaintiff's claim. *Phillips Petroleum Co. v. Texaco, Inc.*, 415 U.S. 125, 127–128, 94 S.Ct. 1002, 1003–1004, 39 L.Ed.2d 209 (1974). Assuming *arguendo* that Plaintiff would allege the application

of the Arbitration Act, the Complaint herein would be brought pursuant to 9 U.S.C. § 4 (1970), which provides that upon a party's failure to arbitrate under a written arbitration agreement, the aggrieved party may petition a district court for an order directing that arbitration proceed. Although the Act would be an essential element of a plaintiff's claim, and is clearly a federal law, the Courts, by looking to the wording of the Act itself, have consistently held that the United States Arbitration Act does not, in and of itself, operate to invoke the jurisdiction of the federal courts. *Litton RCS, Inc. v. Pennsylvania Turnpike Comm'n*, 376 F.Supp. 579, 585 (E.D.Pa. 1974), aff'd mem. *Litton Business Systems, Inc. v. Pennsylvania Turnpike Comm'n*, 511 F.2d 1394 (3rd Cir. 1975) (*Litton*) (citations omitted). One of the first major decisions in this area was *Robert Lawrence Co. v. Devonshire Fabrics, Inc.*, 271 F.2d 402 (2nd Cir. 1959), cert. granted 362 U.S. 909, 80 S.Ct. 682, 4 L.Ed.2d 618 (1960), petition for cert. dism'd per stipulation, 364 U.S. 801, 81 S.Ct. 27, 5 L.Ed.2d 37 (1961) (*Robert Lawrence*). In that case, the Court noted that while new substantive federal rights were created by the Arbitration Act, suits involving the Act did not provide an independent basis of federal jurisdiction. *Id.* at 408 (citations omitted). In so holding, the Court specifically pointed to §§ 3, 4, and 8 of the Act, which appeared to require a jurisdictional basis *other* than the Arbitration Act for actions brought in federal courts. *Id.* This view has been followed in other jurisdictions. *Commercial Metals Co. v. Balfour, Guthrie and Co., LTD.*, 577 F.2d 264, 268–269 (5th Cir. 1978); *Collins Radio Co. v. Ex-Cello Corp.*, 467 F.2d 995, 996, n.1 (8th Cir. 1972); *Monte v. Southern Delaware County Authority*, 321 F.2d 870 (3rd Cir. 1963); *Sear v. Cadillac Automobile Co.*, 501 F.Supp. 1350, 1358 (D.Mass.1980); *Litton*, 376 F.Supp. 579, 585 (E.D.Pa.1974), aff'd mem. 511 F.2d 1394 (3rd Cir. 1975).[2]

---

**2.** The Sixth Circuit, however, did state in *Local 19, Warehouse, Processing and Distributive Workers Union, Retail, Wholesale and Department Store Union v. Buckeye Cotton Oil Co.*, 236 F.2d 776 (6th Cir. 1956) cert. denied 354 U.S. 910, 77 S.Ct. 1293, 1 L.Ed.2d 1428 (1957), (*Local 19*) that under Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, *and* 9 U.S.C. § 1 et seq., "jurisdiction is derived from Article III of the United States

Constitution, which gives the courts of the United States jurisdiction in cases 'in Law and Equity' arising under . . . the Laws of the United States." *Id.* at 780. (citation omitted). This language, insofar as it tracks the "arising under" language of 28 U.S.C. § 1331 (1966), which gives federal courts original jurisdiction of actions arising under the laws of the United States, appears to be an indication that the Sixth Circuit views the United States Arbitration Act as providing a jurisdictional basis for arbitration actions. However, for several reasons, which will be hereinafter set forth, this Court has concluded that the Sixth Circuit did not intend to adopt such a ruling in *Local 19.*

First, the above comments by the Sixth Circuit arose in the context of a discussion of the appropriate substantive law to be applied in *Local 19.* In that case, the Union and Buckeye Cotton Oil Co. had entered into a collective bargaining agreement providing for arbitration of contractual disputes. *Id.* at 779. In the petition filed with the District Court, the Union alleged that Buckeye had violated the agreement by working employees overtime without appropriate compensation, and had refused to arbitrate when requested to do so by the Union. *Id.* at 780. The Union asked that the Court enjoin Buckeye from violating the agreement for overtime pay, and that Buckeye be ordered to submit the dispute to arbitration. *Id.*

The District Court dismissed the complaint by applying *Westinghouse Salaried Employees v. Westinghouse Electric Corp.*, 348 U.S. 437, 75 S.Ct. 489, 99 L.Ed. 510 (1955) (*Westinghouse*), wherein the Supreme Court had severely restricted the extension of § 301. In *Westinghouse*, the Union brought suit against the employer on behalf of unnamed employees, alleging that the employer had violated the collective bargaining agreement by deducting wages for a date when the employees were absent from work. *Id.* at 439, 75 S.Ct. at 489–90. The Union requested an interpretation and declaration of the contractual rights of the parties, an accounting, and a judgment for the amount of the unpaid wages. *Id.* Five members of the Supreme Court agreed to affirm the dismissal of the complaint for lack of jurisdiction, holding that Congress did not intend, under § 301, to confer jurisdiction in federal courts over actions brought by unions to enforce "individual" *id.* at 460, 75 S.Ct. at 500, or "personal" *id.* at 461, 75 S.Ct. at 501, rights of employees.

The Supreme Court in *Westinghouse* did not define which contractual rights would not be considered personal to employees and would thus be sufficient to confer jurisdiction on a federal court. The right to recover unpaid overtime compensation which was involved in *Local 19* appears to fall directly within the *Westinghouse* prohibition, and indeed, that was the foundation for the District Court's dismissal of the complaint. *Local 19*, 236 F.2d at 778. The Sixth Circuit, however, held that *Westing-*

*house* was not controlling, by finding that a promise to arbitrate was not a *personal right* of an employee. *Id.* at 779. (emphasis added).

The District Court in *Local 19* had also premised its dismissal of the complaint on the fact that executory agreements to arbitrate were not enforceable under Tennessee law, and on the fact that injunctive relief in labor disputes was forbidden by the Norris-LaGuardia Act. *Id.* at 778. The Court of Appeals found that the rights involved in *Local 19* were not purely state-created rights, and that therefore Tennessee state law was not controlling. *Id.* at 780–781. In reaching this conclusion, the Court noted, as previously mentioned, that an action under § 301 and the Arbitration Act was one "arising under . . . the Laws of the United States." *Id.* at 780, citing *Local 205, United Electrical, Radio and Machine Workers of America v. General Electric Co.*, 233 F.2d 85 (1st Cir.), *aff'd* 353 U.S. 547, 77 S.Ct. 921, 1 L.Ed.2d 1028 (1957) (*Local 205*). *Local 205*, which was cited by the Sixth Circuit made no comment regarding the jurisdictional effect of the Arbitration Act, but instead only stated that jurisdiction *under § 301* arose under Article III of the Constitution. *Id.* The Sixth Circuit concluded, however, that since the rights involved were created in part by federal law, then *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) and other related cases did not require the application of Tennessee law. 236 F.2d at 780.

The employer in *Local 19*, however, also cited the *Westinghouse* decision as having held that state law governed § 301 actions. *Id.* at 781. The Sixth Circuit disagreed, by first stating that the Supreme Court in *Westinghouse* had construed § 301 solely with reference to a suit for payment of wages, and had not construed the term "suits for violation of contracts between an employer and a labor organization." *Id.* The Court then concluded that its prior decisions, which had authorized injunctions in suits based on violations of such contracts, were still good law. *Id.* This distinction is somewhat less than persuasive, however, given the fact that *Westinghouse* involved a *violation of a collective bargaining agreement in effect between a union and an employer*, *Westinghouse*, 348 U.S. 437, 439, 75 S.Ct. 489, 489–90, 99 L.Ed. 510 (1955) (emphasis added). Moreover, three members of the *Westinghouse* Court described § 301 as merely affording "procedural directions to the federal courts," *id.* at 443, 75 S.Ct. at 491, in actions where "an unincorporated association that happens to be a labor union appears," *id.*, while two other members of the Court stated specifically that Congress did not appear to have authorized "a union to enforce in a federal court the uniquely personal right of an employee for whom it had bargained." *Id.* at 461, 75 S.Ct. at 501.

In addition to the above conclusion, which seems tenuous at best, given the fact that *Westinghouse* and *Local 19* both involved suits

based on alleged employer violations of collective bargaining agreements, the Sixth Circuit also noted that state law did not control because the union had rights and remedies created by the United States Arbitration Act. *Local 19*, 236 F.2d at 781. The Court then determined that the Norris-LaGuardia Act did not prohibit injunctive relief of the type involved in *Local 19* (i.e., specific performance of the arbitration agreement). *Id.* at 782–783. The Sixth Circuit then found that it was free to follow its prior decision in *Milk & Ice Cream Drivers and Dairy Employees Union Local No. 98 v. Gillespie Milk Products*, 203 F.2d 650, 651 (6th Cir. 1953) (*Gillespie Milk Products*), wherein it had "held that the use of the injunctive process was authorized for full enforcement of the rights created by Section 301." *Local 19*, 236 F.2d at 782. The Court also held that § 4 of the Arbitration Act could be applied in *Local 19* to require the Buckeye Cotton Oil Company to arbitrate. *Id.* at 784.

The Court in *Local 19* did not explain why it chose to resort alternatively to the Arbitration Act in *Local 19*, despite the fact that the Act was not even mentioned in *Gillespie Milk Products*, which had also been an action involving arbitration. 203 F.2d at 651. However, the Court in *Local 19* did acknowledge that:

> [T]here is a conflict in the adjudication of both the district courts and circuit courts upon all points covered in this opinion.

*Id.* at 783.

Given the confusion in the law, and the likely future resolution of the conflict among the jurisdictions by the Supreme Court, the Sixth Circuit appears to have been merely providing an alternative method by which specific enforcement of an arbitration clause could be granted. The Sixth Circuit's alternative jurisdictional comments, 236 F.2d at 780, and its failure to address the specific jurisdictional limitations contained in the Arbitration Act may also be explained on this ground.

In 1957, the Supreme Court did resolve the conflict among the jurisdictions by handing down two decisions which obviated the need for the alternative approach used by the Sixth Circuit in *Local 19*, and eliminated the need for application of the United States Arbitration Act to § 301 actions, by holding that § 301 did indeed confer substantive rights. In *Textile Workers Union of America v. Lincoln Mills of Alabama*, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957) (*Lincoln Mills*), the Supreme Court considered whether a district court had authority under § 301 to order an employer to comply with the grievance arbitration provisions of a collective bargaining agreement. *Id.* at 449, 77 S.Ct. at 914. The Court noted that the lower courts had construed § 301 differently, with some courts holding that § 301(a) merely provided jurisdiction in labor disputes, without supplying a source of substantive law, *id.* at 450, 77 S.Ct. at 914, while other courts had held that § 301(a) was more than jurisdictional

in that it authorized federal courts to "fashion a body of federal law," *id.* at 451, 77 S.Ct. at 915, which would include "specific performance of promises to arbitrate grievances under collective bargaining agreements." *Id.* The Court then expressly adopted the latter view, *id.*, and further found that the Norris LaGuardia Anti-Injunction Act did not withdraw the Court's jurisdiction to compel arbitration. *Id.* at 457–458, 77 S.Ct. at 918–919. Interestingly enough, the *Lincoln Mills* Court barely referred to *Westinghouse*, beyond noting in a footnote that it was "quite a different case," *id.* at 456, n.6, 77 S.Ct. at 917, n.6, involving as a basic question the union's standing to sue and recover on individual employment contracts. *Id.* However, the Supreme Court in *Smith v. Evening News Ass'n*, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962), did recognize that *Lincoln Mills* and other "subsequent decisions here have removed the underpinnings of *Westinghouse* and its holding is no longer authoritative as a precedent." *Id.* at 199, 83 S.Ct. at 269.

The failure of the Supreme Court to even mention the United States Arbitration Act in *Lincoln Mills* is a clear implication that the Court rejected its application in § 301 actions. In fact, Justice Frankfurter stated as much in his dissent to *Lincoln Mills*. 353 U.S. at 467–469, 77 S.Ct. at 926–928. (Frankfurter, J., dissenting). Moreover, in a companion case decided the same day as *Lincoln Mills*, the Supreme Court expressly rejected the concept that the United States Arbitration Act provided a substantive body of law or set of remedies to be applied in § 301 actions. In *General Electric Co. v. Local 205, United Electrical, Radio and Machine Workers of America*, 353 U.S. 547, 77 S.Ct. 921, 1 L.Ed.2d 1028 (1957), the Supreme Court affirmed the Second Circuit's reversal of the district court's ruling that a § 301 action to compel arbitration was barred by the Norris-LaGuardia Act. *Id.* at 548, 77 S.Ct. at 922. As previously noted herein, the appellate court in that case had held that the Arbitration Act provided the substantive law and remedies to be applied in § 301 actions. *Local 205*, 233 F.2d 85, 96–101 (1st Cir. 1956). The Supreme Court stated that it "would follow in part a different path, though we reach the same result," (i.e., that the Norris LaGuardia Act did not bar relief) 353 U.S. at 548, 77 S.Ct. at 922. Citing *Lincoln Mills*, the Court then said:

> We think that § 301(a) furnishes a body of federal substantive law for the enforcement of collective bargaining agreements in industries in commerce or affecting commerce and that the Norris-LaGuardia Act does not bar the issuance of an injunction to enforce the obligation to arbitrate grievance disputes.

*Id.* Thus, after the Supreme Court's decision in *Lincoln Mills*, and its affirmance of *Local 205*, there was no longer any confusion with regard to the ability of courts to deal with requests for specific enforcement of arbitration under § 301, and no necessity for alternate approaches to be

In *American Airlines, Inc. v. Louisville and Jefferson County Air Board*, 269 F.2d 811 (6th Cir. 1959) (*American Airlines*), the Sixth Circuit rendered a decision which appears to comport with the generally accepted view of the intended role of the Arbitration Act. In *American Airlines*, since jurisdiction was premised upon diversity, *id.* at 822, the Court had no need to directly address that issue. The Court did consider, *inter alia*, whether Kentucky law or federal law would govern the validity and enforceability of an arbitration clause contained in leases entered into by several airlines and the Louisville and Jefferson County Air Board. *Id.* at 814–815. The Court discussed the Arbitration Act, and stated that:

> Consideration of the legislative history reveals that what the Congress intended was merely to overrule by legislation long-standing judicial precedent, which declared agreements to submit judicable controversies to arbitration contrary to public policy, on the ground that enforcement of such agreements would oust the courts of their jurisdiction. Thus, the congressional purpose was to make arbitration agreements within the scope of the Federal statute *as effective [sic] enforceable as any other contract*, and so permit contracting parties thereby to avoid, if they chose so to do, the "delay and expense of litigation."

*Id.* at 816. (citations omitted) (emphasis added). The Court also noted that the legislative history of the Act indicated that " 'an arbitration agreement is placed upon the same footing as other contracts.' " *Id.* (citation omitted). Although the Court did not discuss the jurisdictional aspects of the Arbitration Act, the above-quoted language

indicates the Court's awareness that the Act did nothing more than eliminate established judicial reluctance to enforce arbitration clauses in contracts. Since federal jurisdiction is unquestionably not present in an ordinary contract case, even one involving interstate commerce, unless the parties are of diverse citizenship, the Sixth Circuit appears to at least implicitly support those decisions which have held that the United States Arbitration Act contemplates a source of federal jurisdiction other than itself in actions involving the Act. As a final point pertinent to analysis, this Court notes that a thorough analysis of the case law pertinent herein has not disclosed any Sixth Circuit decisions wherein the Arbitration Act constituted the sole basis of jurisdiction. Therefore, having concluded that *Local 19*, as discussed in Footnote 2, *supra*, does not dictate the decision herein, and that later Sixth Circuit authority indicates a contrary intent to that expressed in *Local 19*, this Court will now briefly explain its reasons for agreeing with the weight of authority that in actions involving the United States Arbitration Act, an independent ground of federal jurisdiction is required.

The starting point for inquiry must be the Act itself, which the Supreme Court has indicated should be read as a whole. *Bernhardt v. Polygraphic Co. of America, Inc.*, 350 U.S. 198, 201, 76 S.Ct. 273, 275, 100 L.Ed. 199 (1956) (*Bernhardt*). 9 U.S.C. § 1 (1970) defines commerce as used in the Arbitration Act; § 2 provides that agreements to arbitrate in contracts involving commerce shall be valid and enforceable, and the remaining provisions of the Act in general provide for certain procedures to be followed where parties have agreed to arbi-

developed in the event that § 301 was eventually determined to be jurisdictional only.

The foregoing analysis has not been intended by this Court as a suggestion that the Sixth Circuit's jurisdictional comments in *Local 19* were rejected by the Supreme Court. Rather, such an examination has been conducted in an effort to provide the necessary background for understanding both the Sixth Circuit's decision in *Local 19*, which failed to address the substantial jurisdictional limitations expressly stated in the Arbitration Act, and this Court's con-

clusion, that statements entered in a framework of uncertainty and confusion among the circuit courts with regard to their ability to grant specific performance of agreements under § 301, do not abrogate this Court's responsibility to conduct a thorough and well-intentioned analysis of the jurisdictional requirements of the United States Arbitration Act. Therefore, the Court concludes that *Local 19* does not require a conclusion on this Court's part that the Arbitration Act provides jurisdiction herein.

trate, but fail to do so, or where an award has been made, and is required to be confirmed. As noted in *Robert Lawrence*, 271 F.2d 402 (2nd Cir. 1959), cert. granted, 362 U.S. 909, 80 S.Ct. 682, 4 L.Ed.2d 618 (1960), petition for cert. dism'd per stipulation, 364 U.S. 801, 81 S.Ct. 27, 5 L.Ed.2d 37 (1961), certain sections of the Act specifically contemplate a jurisdictional basis other than the Arbitration Act itself. *Id.* at 408. In particular, § 4 provides that:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court *which, save for such agreement, would have jurisdiction under Title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties,* for an order directing that such arbitration proceed in the manner provided for in such agreement.

(emphasis added). Likewise, § 8 gives the Court jurisdiction to deal with maritime cases, *"if the basis of jurisdiction be a cause of action otherwise justiciable in admiralty."* (Emphasis added). These clear jurisdictional limitations comport with the legislative history of the Act, which is devoid of any inference that contracts containing arbitration clauses were intended to invoke federal jurisdiction where a contract without such a clause could not. Representative Graham, who authored the report accompanying the arbitration bill submitted to the House of Representatives, H.R.Rep.No.96, 68th Cong., 1st Sess. 1 (1924), emphasized during debate on the bill in the House, that the bill "does not involve any new principle of law ... creates no new legislation, grants no new rights, except a remedy to enforce an agreement in commercial contracts and in admiralty contracts." 65 Cong.Rec. 1931 (1924) (remarks of Rep. Graham). In addition, H.R.Rep.No.96 stated that the Act was intended to alter the common law doctrine whereby courts refused to enforce such agreements, H.R.Rep.No.96, 68th Cong., 1st Sess. 1, 2 (1924), and further stressed that "[a]rbitration agreements are purely matters of contract, and the effect of the bill is simply to make the contracting party live up to his agreement.... *an arbitration agreement is placed upon the same footing as other contracts, where it belongs."* *Id.* at 1 (emphasis added).

The Committee hearings held on the proposed arbitration resolutions evidence a similar understanding with regard to the Act's limitations. Julius Cohen, who had assisted in drafting the Arbitration Act inserted a brief explaining the proposed Act's provisions into the Committee record. *Arbitration of Interstate Commercial Disputes: Joint Hearings on S. 1005 and H.R. 646 Before the subcommittees of the Committees on the Judiciary,* 68th Cong. 1st Sess. 15, 33 (1924) (Statement of Julius H. Cohen) (hereinafter Joint Hearings). The brief stated that:

> [A] provision for arbitration contained in any contract which involved maritime transactions ... and interstate commerce ... is made "valid, enforceable, and irrevocable," except upon the grounds for which any contract may be revoked.

> • • • • •

> The Federal Courts are given jurisdiction to enforce such agreements *whenever under the Judicial Code they would normally have jurisdiction of a controversy between the parties.*

*Id.* at 34. (emphasis added).

Based on the above expressions of intent, and the explicit jurisdictional limitations contained in the Act itself, Congress appears to have intended that an independent basis of jurisdiction other than the United States Arbitration Act would be required in actions involving the Act.

One other matter remains for resolution, and that is the effect of 9 U.S.C. § 9 (1970), which provides that:

> If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the

award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title. If no court is specified in agreement of the parties, then such application may be made to the United States court in and for the district within which such award was made. Notice of the application shall be served upon the adverse party and thereupon the court shall have jurisdiction of such party as though he had appeared generally in the proceeding.

The contract herein does contain a provision stating that judgment may be entered upon an arbitration award in any court having jurisdiction. § 7.9.1. Further, as the arbitration award upon which Plaintiff relies was apparently rendered in this judicial district (Doc. # 1, ¶ 14, ¶ 15; Doc. # 20, p. 1), § 9 would appear to permit this Court to enforce that award. However, given the express statutory directives in §§ 4 and 8, which limit the district court's jurisdiction to cases wherein the court would otherwise have subject matter jurisdiction, and the Supreme Court's instruction that the Act be read as a whole, *Bernhardt*, 350 U.S. 198, 201, 76 S.Ct. 273, 275, 100 L.Ed. 199 (1956), this Court cannot read § 9 in so illogical a manner. Such an interpretation would make jurisdiction of actions brought on the basis of identical contracts contingent upon whether the parties involved sought to compel arbitration, or merely wished confirmation of an award already granted through arbitration. It is difficult to perceive the basis for such a jurisdictional distinction, because in both situations, the ultimate result desired would be the same. For a similar decision, refusing to construe the Arbitration Act in a manner which would result in "an odd patchwork of individual statutes, bereft of any coherent plan," *see: Bangor and Aroostook R.R. Co. v. Maine Central R.R. Co.*, 359 F.Supp. 261, 263 (D.C. 1973). Cf. *Ballantine Books, Inc. v. Capital Distributing Co.*, 302 F.2d 17, 19 (2nd Cir. 1962) (concluding without discussion, that on the basis of the *Robert Lawrence* decision, an independent source of federal jurisdiction was required in a proceeding under § 9).

Again, the legislative history of the Arbitration Act sheds light upon the intended meaning of the Act. During the subcommittee hearings held on the proposed Senate and House Arbitration bills, the following exchange took place:

Representative HICKEY. *Without a written agreement, Mr. Cohen, where would an arbitration be held?*

MR. COHEN. *It would be held in accordance with the direction of the court; by direction of the court to which you apply.*

Representative HICKEY. *And the application would be made to the court where the party asking for the arbitration resides?*

MR. COHEN. *You would have to get jurisdiction just as you do now in a Federal court; by personal service.*

Representative HICKEY. Where the defendant lives?

MR. COHEN. *Where the defendant lives. That would mean practically that you have to go to the jurisdiction where the defendant is, or wait until he comes into your jurisdiction so that process may be served upon him.* The process is exactly the same as in civil procedure in the Federal courts.

*Joint Hearings*, 68th Cong., 1st Sess. 18 (1924) (statement of Julius H. Cohen) (emphasis added). In response to the above colloquy, the Committee Chairman then said:

Here is the provision relating to that.

Representative HICKEY. The fourth section?

The CHAIRMAN. This is on page 7, section 10, beginning with line 8 [reading]:

If no court is specified in the agreement of the parties, then such application may be made to the United States court in and for the district within which such award was made. Notice of the application shall be served upon the adverse party.

Then this [continuing reading]:

If the adverse party is a resident of the district within which the award was made, such service shall be made upon the adverse party or his attorney as prescribed by law for service of notice of motion in an action in the same court.

That makes it very clear.

*Id.* at 18–19. This explanation contained in the relevant legislative history indicates that § 9 was only intended as a guide to where arbitration should take place when no agreement had been made by the parties, and was not intended as an independent grant of jurisdiction in federal courts.

■ Based on the foregoing reasoning, the Court concludes that in actions brought to confirm arbitral awards under § 9 of the Arbitration Act, the same prerequisite, of an independent ground of federal jurisdiction, applies as has been required in actions involving other sections of the Act. Having found no diversity jurisdiction between the parties herein, and no basis for federal jurisdiction other than the United States Arbitration Act, the Court concludes that it does not have subject matter jurisdiction over the present controversy. Therefore, Defendant's Motion to Dismiss must be granted. Although this ruling is dispositive with regard to the continuance of the present action, the Court has determined to address as well the sovereign immunity arguments raised by the Defendant.

### C. *Sovereign Immunity*

The Defendant has maintained that the within action must be dismissed because the Board, as an arm of the State of West Virginia, is immune from suit under the doctrine of sovereign immunity. Defendant has not specified under which portion of Fed.R.Civ.P. 12(b), this ground of dismissal has been raised, but there have been indications by the Supreme Court that such a motion relates to the subject matter jurisdiction of the Court. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974) (*Rhodes*). Therefore, the Court will, on the basis of that ruling, consider Defendant's motion as having been brought pursuant to Fed.R.Civ.P. 12(b)(1), for lack of subject matter jurisdiction. The Court also notes that the standards applicable to Rule 12(b)(1) and (b)(6) motions are the same. *Id.* at 236, 94 S.Ct. at 1686. Thus, the Court must construe the allegations of the complaint favorably to the pleader, and must in addition follow the accepted rule that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.,* citing *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957).

■ Before engaging in the analysis required for determining whether the present action against the Board may be maintained, a few comments are in order. First, although the Supreme Court in *Rhodes* disapproved the district court's dismissal of the case, as a premature decision "precluding any opportunity for the plaintiff by subsequent proof to establish a claim, 416 U.S. at 236, 94 S.Ct. at 1686, that ruling does not mandate a similar decision herein. Unlike the present case, *Rhodes* involved claims against individual state officers for deprivation of federal rights. Those matters were found by the Supreme Court to be judicially cognizable and to not be barred by the application of the Eleventh Amendment. *Id.* at 237–238, 94 S.Ct. at 1686–1687. With respect to the alternate ground for dismissal, which had been premised upon executive immunity, *id.* at 238, 94 S.Ct. at 1687, the Court indicated that since the immunity to be accorded the executive officers was qualified rather than absolute, *id.* at 242, 243, 247, 94 S.Ct. at 1689, 1690, 1691–92, and required a determination with regard to whether the state officials acted in good faith, *id.* at 250, 94 S.Ct. at 1693, a further development of the factual background of the action was required. *Id.* Implicit in the Court's statements, however, is that where the immunity involved is absolute, or is not premised upon a factual question such as the existence of good faith, a decision at the pleading stage is appropri-

ate. Therefore, since the issue before this Court involves an immunity which if present, will be absolute, and further, necessitates resolution of no factual matters, the Court concludes that under *Rhodes*, it may properly proceed to determine whether this action is barred under the doctrine of sovereign immunity.

■ The Eleventh Amendment provides that:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

The Eleventh Amendment has long been construed as prohibiting suit against a state by its own citizens or citizens of another state. *Hans v. Louisiana*, 134 U.S. 1, 10, 14–15, 10 S.Ct. 504, 506–507, 33 L.Ed. 842 (1889). Therefore, if the present action had been initiated directly against the State of West Virginia, it would unquestionably be barred. The Defendant herein, however, is the Board of Regents rather than the State of West Virginia. Under *Wyoming Highway Comm'n*, 278 U.S. 194, 49 S.Ct. 104, 73 L.Ed. 262 (1929), a state agency may enjoy the State's immunity from suit, if that agency is found to be an arm, or alter ego, of the state. *Id.* at 199, 49 S.Ct. at 105–106. By virtue of this theory, then, the Board has claimed that it is merely an arm of the State of West Virginia, and is not subject to

suit, except in the West Virginia Court of Claims. In response to this argument, Plaintiff has contended that the Board is not an arm or alter ego of the State of West Virginia; that the Board is not performing a government function; and that, even assuming that the Board would be immune from suit, the Board has waived its immunity by engaging in interstate commerce.

In *Morgantown*, 153 W.Va. 121, 168 S.E.2d 298 (1969), the West Virginia Supreme Court indicated that in order for sovereign immunity to apply, the agency in question must be acting as an arm of the state, and must be performing a governmental function. *Id.* at 125–127, 168 S.E.2d 301–302. This Court has already determined that the Board of Regents is an arm or alter ego of the State of West Virginia, and sees no reason to repeat that lengthy discussion. Moreover, in *Morgantown*, the Court specifically found administration of the affairs of a state educational association to be a governmental function. *Id.* at 126–127, 168 S.E.2d 302. Further, as previously mentioned, the federal courts which are concerned with interpreting and applying West Virginia law, have concluded that suit against the West Virginia Board of Regents is barred under the doctrine of sovereign immunity. *Kondos*, 318 F.Supp. 394, 396–397 (E.D.W.Va.1970), aff'd 441 F.2d 1172 (4th Cir. 1971).[3] Given the unequivocal rul-

**3.** As previously noted, in the Court's discussion of diversity jurisdiction, Plaintiff has cited the *Kondos* case for a number of incorrect propositions. In addition to those items formerly commented upon by the Court, Plaintiff has contended that the *Kondos* sovereign immunity ruling, and thus all comments in *Kondos* regarding the Board's role as an arm of the State, are merely dicta, because the decision of the district court actually was premised solely upon the fact that the complaint did not state a cause of action in libel against the President of Marshall University. (Doc. # 8, p. 4). Since the dismissal of the claim on that ground ended any potential claim against the Board of Regents, Plaintiff has argued that, therefore, any other matters discussed in *Kondos* were surplusage. However, an examination of the *Kondos* decision indicates that Plaintiff's reading is erroneous, and that in fact, the Court's holding therein was directly contrary to Plaintiff's con-

tentions. In *Kondos*, the Plaintiff had sued the West Virginia Board of Regents, and the President of Marshall University, Roland Nelson on two grounds, for breach of an employment contract, and for the alleged publication of defamatory remarks by Nelson. 318 F.Supp. at 395, 397. Both defendants had filed motions to dismiss, claiming immunity from suit. *Id.* at 396. The Court first considered the Board's Motion, and found that the Board, which was immune from suit as an arm of the State of West Virginia, must be dismissed from the action. *Id.* at 396–397. Then, the Court considered Nelson's motion, and found that since there were no allegations that Nelson had transgressed the authority given him by the Board, the breach of contract claim against him must also be dismissed. *Id.* With respect to the libel and slander claim against Nelson, however, the Court conducted an analysis of the pertinent law, and

ings by the State and federal courts of West Virginia, which have been previously cited and thoroughly examined by this Court, the present action against the Board must, absent other circumstances, be dismissed. Plaintiff, however, has contended that federal law rather than state law, must be applied, and that under *Parden v. Terminal Railway of the Alabama State Docks Dept.*, 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964) (*Parden*), the Board has waived its immunity, or consented to suit, by engaging in interstate commerce. The Board has replied by distinguishing *Parden* from the present situation, and by noting that *Parden* has been significantly limited by subsequent Supreme Court decisions. In addition to these arguments, other points have been raised in the memoranda filed by the parties, and will be addressed to the extent they may be pertinent to the resolution of the matters under discussion.

In *Parden*, an employee of the Alabama Terminal Railway brought suit in federal court against the Railway pursuant to the Federal Employer's Liability Act, requesting damages for personal injuries sustained while employed by the Railway. *Id.* The State of Alabama moved to dismiss the action because the Railway was a state agency, and the State had not waived its immunity from suit. *Id.* at 185, 84 S.Ct. at 1209. The Supreme Court found that in enacting the F.E.L.A., Congress had intended to make the statute applicable to every common carrier by railroad in interstate commerce, including state-owned railroads. *Id.* at 187–188, 84 S.Ct. at 1210–1211. Specifically, the Court pointed to the "broad and all-embracing" language of the Act, *id.* at 189, 84 S.Ct. at 1211, and the fact that if states were exempted from suit under the F.E.L.A., the injured employees of State-

owned railroads would have no effective remedy. *Id.* at 190, 84 S.Ct. at 1211–1212. The Court further found that by authorizing Congress to regulate commerce, the States had empowered Congress to create a right of action against interstate railroads, *id.* at 192, 84 S.Ct. at 1213, and stated that:

> By enacting the F.E.L.A. in the exercise of this power, Congress conditioned the right to operate a railroad in interstate commerce upon amenability to suit in federal court as provided by the act; by thereafter operating a railroad in interstate commerce, Alabama must be taken to have consented to suit.

*Id.* Four members of the Court dissented in. *Parden, id.* at 198, 84 S.Ct. at 1216, on the basis that the legislative history of the F.E.L.A. indicated that "Congress did not even consider the possible impact of its legislation upon State immunity from suits." *Id.* at 199, 84 S.Ct. at 1216. The dissent noted that conditioning a state's power to operate in interstate commerce in the manner decreed by the majority should be a decision for Congress rather than the Courts, *id.* at 198, 84 S.Ct. at 1216, and further observed that:

> In previous opinions the Court has indicated that waiver of sovereign immunity will be found only where stated by "the most express language or by such overwhelming implication for the text as would leave no room for any other reasonable construction."

*Id.* at 200, 84 S.Ct. at 1217, quoting from *Murray v. Wilson Distilling Co.*, 213 U.S. 151, 171, 29 S.Ct. 458, 464, 53 L.Ed. 742 (1909); citing as supportive *Ford Motor Co. v. Dept. of Treasury*, 323 U.S. 459, 468–470, 65 S.Ct. 347, 352–53, 89 L.Ed. 389 (1945).

This Court has taken particular care to discuss the dissenting opinion in *Parden*,

found that under the circumstances present, his actions must have been malicious for a claim to be stated. *Id.* at 397–398. Because no allegations of malice had been made, the Court ruled that the complaint did not state a cause of action against Nelson, but granted the plaintiff an opportunity to amend his complaint to allege with particularity the libelous words, and slanderous material involved, as well as the circumstances surrounding their utterance and

publication by Nelson. *Id.* at 398. Thus, while the action against the Board was dismissed, the Court specifically found that an action against Nelson, the President of Marshall University, might be maintained. This Court regrets the necessity for engaging in the foregoing laborious explanation of a point which should be obvious, but has felt constrained to do so in light of the Plaintiff's incorrect analysis of the *Kondos* decision.

because later modification of the *Parden* doctrine has lent increasing importance to the views expressed by the dissent. In *Employees v. Dept. of Public Health and Welfare of Missouri*, 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973) (*Missouri Employees*), the majority opinion was authored by Justice Douglas, who had dissented in *Parden*. The Supreme Court in *Missouri Employees* considered whether employees of a Missouri state agency were entitled to bring suit against the State for overtime compensation due to them under § 16(b) of the Fair Labor Standards Act of 1938. *Id.* at 281, 93 S.Ct. at 1616. Although the state enterprise involved was technically covered by the Act, *id.* at 283, 93 S.Ct. at 1617, Justice Douglas and five other members of the Court determined that Congress did not intend to deprive the States of their constitutional immunity from suit. *Id.* at 285, 93 S.Ct. at 1618. In *Missouri Employees*, Douglas did not expressly overrule *Parden*, but his opinion implicitly rejects the majority language in *Parden*, and clearly changes the focus of the *Parden* analysis to that advocated by the *Parden* dissent.

First, Douglas distinguished *Parden* from *Missouri Employees* by noting that *Parden* involved a business operated by the State "for profit," *id.* at 284, 93 S.Ct. at 1617, and "was in the area where private persons and corporations normally ran the enterprise." *Id.* Douglas then found that where the state activity was not conducted for profit, Congress could only act where the employees "have such a relation to interstate commerce that national policy, of which Congress is the keeper, indicates that their status should be raised." *Id.* In addition, Douglas noted that when Congress did act, enormous fiscal burdens could be placed upon the States, and he commented that "Congress, acting responsibly, would not be presumed to take such action silently." *Id.* at 284–285, 93 S.Ct. at 1618. Following these remarks, the Court stated that:

> It would . . . be surprising in the present case to infer that Congress deprived Missouri of her constitutional immunity without changing the old § 16(b) under which she could not be sued or *indicating*

*in some way by clear language that the constitutional immunity was swept away.* *Id.* at 285, 93 S.Ct. at 1618. (Emphasis added). This emphasized language in particular, alters the majority *Parden* analysis to fit the view advocated by the dissent in *Parden*, which would have required an indication by express language that Congress intended to abrogate a state's sovereign immunity. *Parden*, 377 U.S. at 200, 84 S.Ct. at 1217.

Plaintiff has suggested in its reply memorandum (Doc. # 10) that the *Missouri Employees* decision has been overruled by Congress' Amendment of the Fair Labor Standards Act in 1974. Congress did amend 29 U.S.C. § 216(b) in 1974 to provide that suit could be brought by state employees against their employers. *National League of Cities v. Usery*, 426 U.S. 833, 838, 96 S.Ct. 2465, 2468, 49 L.Ed.2d 245 (1976). However, that action by Congress had no effect upon the analytical framework used by the Supreme Court in the *Missouri Employees* decision, but rather, indicated Congress' express compliance with the Court's directive in *Missouri Employees* that, before a state's traditional immunity would be found to have been abrogated, Congress must provide a clear indication of such an intent. *Missouri Employees*, 411 U.S. 279, 285, 93 S.Ct. 1614, 1618, 36 L.Ed.2d 251 (1973). Congress' compliance with the Supreme Court's *Missouri Employees* instruction is made abundantly clear in the House of Representatives Report which accompanied the Fair Labor Standards Amendments of 1974. H.R.Rep.No.93–913, 93rd Cong. 2d Sess. 1, reprinted in [1974] U.S.Code of Cong. & Ad.News 2811. Therein, it was stated that:

> Section 16(b) of the Act is amended to *make it clear* that suits by public employees to recover unpaid wages and liquidated damages under such section may be maintained in a Federal or State court of competent jurisdiction. *This amendment is intended to overcome that part of the decision of the Supreme Court in Employees of the Department of Public Health v. Missouri (93 S.Ct. 1614, April 18, 1973), which stated that Congress had not ex-*

*plicitly provided in enacting the 1966 amendments that newly covered State and local employees could bring an action against their employer in a Federal court under section 16.*

*Id.* at 2853. (Emphasis added). Obviously then, the 1974 Amendment of 16(b) was intended *only* to provide the specific statement of Congressional intent to abrogate immunity which had been requested by the Supreme Court in *Missouri Employees*, and operated to alter *only* that part of the decision which exempted states from suit under § 16(b).

Although there is no question in this Court's mind regarding the effect of the 1974 Amendments upon the continued vitality of the *Missouri Employees* decision, the Court notes that in *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), the Supreme Court in a plurality opinion written by Justice Rehnquist, *id.* at 834, 96 S.Ct. at 2466, ruled that insofar as the 1974 Amendments operated "to directly displace the State's freedom to structure integral operations in areas of traditional governmental functions," *id.* at 852, 96 S.Ct. at 852, they were not within the authority granted to Commerce by the Commerce Clause. *Id.* Therefore, the Court reversed the district court's dismissal of the complaint below, which had been brought by various parties, including several states, for a declaration that the 1974 Amendments were invalid as an unconstitutional interference with the states qua States. *Id.* at 836–837, 839, 96 S.Ct. at 2467–2468, 2468. In addition, the case relied upon by Plaintiff herein, as support for its theory that *Missouri Employees* is no longer valid, was vacated and remanded by the Supreme Court in light of the decision in *National League of Cities v. Usery. See, Dunlop v. State of New Jersey*, 522 F.2d 504 (3rd Cir. 1975) vacated and remanded sub. nom. *New Jersey v. Usery*, 427 U.S. 909, 96 S.Ct. 3196, 49 L.Ed.2d 1202 (1976).

The preceding discussion has illustrated that the 1974 Amendment of the Fair Labor Standards Act did not overrule the *Missouri Employees* decision. In order to finally lay

to rest any doubts concerning the current effect of that decision, this Court will briefly outline the Supreme Court decisions after *Missouri Employees* which have applied or altered the "express language" analysis required by *Missouri Employees.* The only significant change in the *Missouri Employees* doctrine appears to have occurred in *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) (*Hutto*), wherein the Court, in a plurality opinion, ruled that attorney fees could be awarded against the States in actions brought under 42 U.S.C. § 1983, even where Congress had not provided express statutory language making a state liable for such fees. *Id.* at 693–694, 98 S.Ct. at 2574–2575. In making this determination, the Court first pointed to the extreme breadth of the Civil Rights Attorneys Fees Awards Act, which contained no hint of an exemption for States who happened to be defending injunction actions. *Id.* The Court then surveyed the legislative history of the Act, and found express evidence therein that Congress had intended to permit attorney fees to be awarded against the States. *Id.* In addition, the Court distinguished *Missouri Employees*, and *Edelman v. Jordan*, 415 U.S. 651, 672, 94 S.Ct. 1347, 1360, 39 L.Ed.2d 662 (1972) (holding Congressional authorization of suit to be a threshold requirement under *Parden* and *Missouri Employees*) from *Hutto*, by noting that those actions had been concerned with "retroactive liability for prelitigation conduct," 437 U.S. at 695, 98 S.Ct. at 2576, while *Hutto* involved prospective relief. *Id.* The Court further restricted its holding by noting that attorney fees had traditionally been awarded without regard to a state's sovereign immunity, *id.*, and by indicating that the limitations placed upon the States by the Fourteenth Amendment may be more stringent than those imposed under the Commerce Clause. *Id.* at 698–699, n.27, 98 S.Ct. at 2577–2578, n.27, citing *National League of Cities v. Usery*, 426 U.S. 833, 852, n.17, 96 S.Ct. 2465, 2474, n.17 (1976).

Four members of the Court dissented from this portion of the *Hutto* decision, 437 U.S. at 704, 98 S.Ct. at 2580, objecting to what they termed "the dilution of the 'clear

statement' rule," *id.* at 707, 98 S.Ct. at 2582, occasioned by the plurality's reliance on legislative history rather than explicit statutory language authorizing a monetary recovery against the States. *Id.* at 706, 98 S.Ct. at 2581. Justice Powell, writing for the dissent, also stated that he did not find either of the limitations cited by the Court to be justification for such a dilution. *Id.* at 707, 98 S.Ct. at 2582. Despite this disagreement, the *Hutto* modification was applied in *Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 39 L.Ed.2d 358 (1979) (*Quern*), which considered whether a district court was prohibited by the Eleventh Amendment from ordering the State of Illinois to send a notice to class members, advising them that they might be entitled to past welfare benefits. *Id.* at 334–335, 99 S.Ct. at 1141–1142.

In the process of reaffirming its prior holding in *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1972), that § 1983 did not abrogate the traditional sovereign immunity of the States, 440 U.S. 338–345, 99 S.Ct. 1143–1147, and in concluding that the notice involved in *Quern* constituted the type of prospective relief permitted by *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) even in the face of the Eleventh Amendment, 440 U.S. at 345, 347, 99 S.Ct. at 1147, 1148, the Supreme Court applied the modified *Hutto* analysis. *Id.* at 344–345, 99 S.Ct. at 1146–1147. The Court emphasized, however, that an express statutory waiver of State immunity was required by *Missouri Employees, id.* at 344, n.16, 99 S.Ct. at 1147, n.16, and noted again that *Hutto* was concerned with prospective relief rather than retroactive liability for prelitigation conduct. *Id.*

The foregoing analysis has indicated that *Missouri Employees* has continued to be applied in Supreme Court decisions, with a slight analytical modification for cases which involve prospective relief rather than retroactive liability for prelitigation conduct. In addition, the distinction noted by Douglas in *Missouri Employees,* 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973), concerning the classification of a state activity as for profit, or not for profit, *id.* at

284, 93 S.Ct. at 1617, appears to have been discarded, as later cases concentrate primarily on the threshold issue of whether Congress has authorized suit against the states. *Edelman v. Jordan,* 415 U.S. 651, 672, 94 S.Ct. 1347, 1360, 39 L.Ed.2d 662 (1972). Assuming *arguendo* that such a distinction exists, this Court can find no inference of profit-making in the construction of buildings on a state university campus, with all funds pertaining thereto to be deposited in the state treasury. Therefore, because the present case involves retroactive liability for pre-litigation conduct, unlike *Hutto, and* activity not conducted for profit, the criteria outlined in *Missouri Employees,* without the *Hutto* "dilution," are properly applicable to the determination of whether West Virginia's traditional sovereign immunity may be herein set aside.

In order to properly consider the above question, the Court makes two related but necessary assumptions. First, since a statutory basis for waiver of immunity is required under *Missouri Employees,* the Court assumes that the United States Arbitration Act applies to this proceeding. Again, although Plaintiff did not raise the Act in its pleadings, the Act has been mentioned by both parties in their memoranda. Therefore, the Court must assume that Plaintiff would amend its pleadings to allege the application of the Act, if offered an opportunity. Secondly, the Court assumes that the Board engaged in interstate commerce during the transaction at hand. Plaintiff has claimed the Board's participation in interstate commerce involves a factual inquiry and precludes dismissal of the present action at the pleading stage. However, the resolution of this issue in Plaintiff's favor, for purposes of ruling upon the within motion, obviates the necessity of searching beyond the pleadings. Again, while the complaint did not allege interstate commerce activity on the part of the Board, that contention has been raised and discussed by the parties, and is a prerequisite under *Missouri Employees,* for a finding that West Virginia has waived its immunity, or consented to suit, by engaging in interstate commerce.

With these assumptions in mind, the Court now turns to the threshold question of whether Congress intended to abolish the traditional immunity of the States when it enacted the United States Arbitration Act.

■■■ First, the Court notes that, on its face, the United States Arbitration Act does not expressly authorize suit against States qua States, or evidence a Congressional intent to abrogate state immunity from suit. Although 9 U.S.C. § 1 (1970) defines commerce broadly, that section by its terms does not authorize suit against anyone, but instead merely identifies those transactions which may come within the Act, that is, those involving maritime or interstate commerce. Moreover, although commerce is defined in § 1 as "commerce among the several states, ... or with foreign nations," that definition is only a repetition of the phrasing of U.S.Const. Art. I, § 8, cl. 3, wherein Congress is given the power "[t]o regulate Commerce with foreign nations, and among the several states, and with the Indian Tribes." Simply because interstate commerce is included within the purview of the Arbitration Act, the conclusion does not follow that the Act was intended to abolish the sovereign immunity of those states engaging in interstate commerce.

The provision of the Arbitration Act which does authorize suit, or provide "a federal remedy," *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 400, 87 S.Ct. 1801, 1804, 18 L.Ed.2d 1270 (1967), is 9 U.S.C. § 4 (1970). In that section as originally enacted in 1925, and continued virtually unchanged until the present time, a party aggrieved by the failure of another party to arbitrate under a written agreement, could apply to a district court which, except for the agreement, would have jurisdiction of the subject matter of the controversy. As previously noted, in 1925, a federal court could not have had diversity jurisdiction over a contract claim between a state and a citizen of another state. *Postal Telegraph*, 155 U.S. 482, 487, 15 S.Ct. 192, 194, 39 L.Ed. 231 (1894). Moreover, since the subject matter of an arbitration agreement is purely contractual, and thus, traditionally within the domain of state courts, it is exceedingly unlikely that a federal court would have had jurisdiction over such an action on any other basis in 1925. However, because that possibility cannot be totally eliminated by the statutory language, which does not exclude states, an analysis of the legislative history of the Arbitration Act is proper in order to determine whether "Congress has brought the States to heel, in the sense of lifting their immunity from suit in a federal court." *Missouri Employees*, 411 U.S. 279, 283, 93 S.Ct. 1614, 1617, 36 L.Ed.2d 251 (1973). An examination of the legislative history of the United States Arbitration Act establishes beyond peradventure that Congress had no intention of abolishing state immunity from suit when it enacted the Arbitration Act.

The United States Arbitration Act was reported to the House of Representatives as H.R. 646 on January 24, 1924. H.R. 646, 68th Cong. 1st Sess., 65 Cong.Rec. 1430 (1924). The Judiciary Committee Report which accompanied the bill stated that:

The purpose of this bill is to make valid and enforceable agreements for arbitration contained in contracts involving interstate commerce or within the jurisdiction of admiralty, or which may be the subject of litigation in the Federal courts ... there was no opposition to the bill before the Committee.

. . . .

The bill declares simply that such agreements for arbitration shall be enforced, and provides a procedure in the Federal Courts for their enforcement.

H.R.Rep.No.96, 68th Cong., 1st Sess. 1, 2 (1924). When the bill was first debated in the House of Representatives, Mr. Graham, from the House Judiciary Committee, *id.* at 1, explained that the bill represented an attempt to correct a practice inherited from English Common Law, whereby courts refused to enforce arbitration agreements. Although the parties involved might have contracted to arbitrate, the courts believed that such agreements usurped their jurisdiction. 65 Cong.Rec. 1931 (1924) (remarks

of Rep. Graham). As has been previously noted, Graham further commented that the bill "does not involve any new principle of law ... creates no new legislation, grants no new rights, except a remedy to enforce an agreement in commercial contracts and in admiralty contracts." *Id.* The bill was then passed unanimously, without debate, by the House on June 26, 1924, 65 Cong.Rec. 11081, 11082 (1924), and was then referred to the Senate for consideration by that body. 65 Cong.Rec. 11124 (1924). The Senate also had under evaluation an arbitration bill, S. 1005, which was amended by the Senate Judiciary Committee to conform with H.R. 646 in all essential respects. 66 Cong.Rec. 2759, 2761 (1925). The Senate Judiciary Committee Report accompanying S. 1005 echoed the concerns and legislative purpose expressed by the members of the House of Representatives. S.Rep.No.536, 68th Cong., 1st Sess. 2, 3 (1924). The Report also specifically set forth a desire to avoid delay in litigation, and noted that "[t]he settlement of disputes by arbitration appeals to big business and little business alike, to corporate interests as well as to individuals." *Id.* at 3 (emphasis added).

On January 31, 1925, the Senate debated the Arbitration Act, and adopted the Senate counterpart to H.R. 646. 66 Cong.Rec. 2759, 2761 (1925). The Senate debate, like that in the House of Representatives, was very brief, and did not address any matter even remotely connected to the subject of sovereign immunity. *Id.* Finally, on February 4, 1925, the House of Representatives adopted the version of the United States Arbitration Act approved by the Senate, while specifically noting that there were no substantive differences between the Senate version of the Act and that originally passed by the House of Representatives and sent to the Senate. 66 Cong.Rec. 3003, 3004 (1925).

As a final indication of legislative intent, the joint subcommittee hearings held concerning S. 1005 and H.R. 646, do not at any point address the issue of sovereign immunity, and do not contain any evidence that the Act's contemplated reach would extend to states participating in interstate com-

merce. Joint Hearings, 68th Cong., 1st Sess. 1 (1924). To the contrary, the hearings illustrate that the transactions thought to be covered by the Act, were merely those ordinary dealings between merchants who happened to live in different states. This fact is illustrated by the following colloquy:

Rep. Charles Stengle: What you have in mind is that this proposed legislation relates to contracts arising in interstate commerce.

Mr. Bernheimer: Yes; entirely. The farmer who will sell his carload of potatoes, from Wyoming, to a dealer in the State of New Jersey, for example.

*Id.* at 7 (Statement of Charles L. Bernheimer).

The preceding survey of the legislative history of the Arbitration Act has indicated that Congress intended the Act to remedy the practice whereby courts had refused to enforce valid arbitration agreements entered into by parties, but did not intend the Act to create any new rights or obligations. Since permitting suit to be brought against a state on the basis of a contract would unquestionably have created novel rights by abrogating traditional concepts of state immunity, Congress cannot "be presumed to have taken such action silently," *Missouri Employees*, 411 U.S. 279, 284–285, 93 S.Ct. 1614, 1617–1618, 36 L.Ed.2d 251 (1973), particularly when the language of the statute itself does not indicate an intent to sweep away constitutional immunity. *Id.* at 285, 93 S.Ct. at 1618.

■ Having concluded that the legislative history and explicit statutory language of the United States Arbitration Act do not evidence a Congressional intention to abrogate the States' sovereign immunity, the Court further finds that Congress did not, in fact, abolish the States' traditional immunity from suit by passage of the Arbitration Act. Because this conclusion is dispositive under *Missouri Employees*, the Court need not address the further question of whether the Board has waived its immunity by engaging in interstate commerce after the passage of the Act. Thus, since the

Board, as an arm of the State of West Virginia, is immune from suit under both State and federal law, the within action against the Board of Regents is barred. In so holding, the Court notes that the Plaintiff does have a viable remedy against the Board in the West Virginia Court of Claims. *Parden*, 377 U.S. 184, 190, 84 S.Ct. 1207, 1211, 12 L.Ed.2d 233 (1964); *Morgantown*, 153 W.Va. 121, 168 S.E.2d 298 (1969).

## IV. *Conclusion*

Based on the preceding analysis, the Court finds that:

1. Plaintiff's request for a preliminary injunction is denied, due to the fact that Plaintiff has failed to demonstrate either a likelihood of success on the merits, or the existence of irreparable harm;

2. Defendant's Motion to Dismiss is granted, because this Court does not have jurisdiction over the subject matter of the present action.

3. The Plaintiff's motions, seeking orders of the Court to compel discovery and expressing a disinclination to sustain the Defendant's motion to dismiss, are deemed moot and will, therefore, not be ruled upon.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.