TRUSTEES OF CARRICK ACADEMY *v.* R. A. CLARK *et al.*

(*Nashville.* December Term, 1903.)

1. **CORPORATIONS. Private defined.**

A private corporation is created for the immediate benefit and advantage of the individuals constituting it, and the franchises conferred are to be exercised for their advantage, and the property owned by it is held .for them, and the profits may be divided among them. (*Post, pp.* 494-495, 500.)

2. **SAME. Public defined.**

Public corporations are created for public purposes, and the property ·controlled by them is devoted to public purposes; and the corporators have no private beneficial interest in the franchises granted or the property controlled further than that possessed in common by all citizens in the property of the State, except. the right to be and act as corporators. (*Post, p.* 495.)

3. **SAME. Same. Public interest or character is not affected by source of the property.**

The public character of the property and interest in a public corporation is not affected by the source from which the property comes, for a purchase by or a gift to the corporation is in reality a purchase by or a gift to the public, and property so acquired is to be administered by the corporation as an agency of the State. (*Post, p.* 495.)

4. **SAME. Public are under the control of the legislature.**

Public corporations created for public convenience, with no private rights involved, are public agencies, and as such are under the control of the legislature. (*Post, pp.* 496-502.)

Cases cited and approved: Governor v. McEwen, 5 Hum., 241; Mobile School Commissioners v. Putnam, 44 Ala., 506; Trustees of the University of Alabama v. Winstead, 5 Stew. & P., 17;

Trustees, etc., v. Clark.

Head v. Curators of Missouri, 47 Mo., 224; University of North Carolina v. Maultsby, 43 N. C., 257; State of Florida, ex rel., v. Knowles, 16 Fla., 577.

Case cited and distinguished: Trustees of Dartmouth College v. Woodward, 4 Wheat., 519.

5. **SAME.** Same. Case in judgment.

Carrick Academy of Franklin county, incorporated by the legislature, was a mere educational agency of the State, and was a public institution under the control of the legislature, and a statute authorizing the trustees of that academy to lease the academy property to a certain other incorporated educational institution is valid and constitutional. (*Post, pp.* 485-502.)

Acts cited and construed: 1789, ch. 3; 1803, chs. 81 and 82; 1806, chs. 7 and 8; 1807, ch. 64; 1809, chs. 52 and 109; 1817, ch. 97, sec. 4; 1881, ch. 63.

---

FROM FRANKLIN.

---

Appeal from the Chancery Court of Franklin County. —T. M. McCONNELL, Chancellor.

IKE W. CRABTREE, LYNCH & LYNCH, and ESTILL & LITTLETON, for complainants.

GRANBERY & TRABUE, for defendants.

MR. JUSTICE BEARD delivered the opinion of the Court.

The present bill is filed by four out of five trustees of the Carrick Academy, a body corporate, as such trustees and "in their own right as citizens and taxpayers of Franklin county, and for and on behalf of the school fund and of the school children as well as on behalf of the citizens and taxpayers of Franklin county," against R. A. Clark and R. C. Baker (the last being the fifth trustee), and the county of Franklin, and the Winchester Normal College, a duly chartered and organized corporation under the laws of Tennessee.

The purpose of the bill is to have declared void a lease made on the twenty-second day of December, 1881, by the then trustees of Carrick Academy of the property of the academy to the defendant the Winchester Normal College for the period of fifty years, to recover rent for this property from the defendant Clark upon the ground that under this lease he has had the use of the property, and also for the purpose of obtaining a decree for the sale of the property, so that the proceeds thereof may be put into the treasury of Franklin county "for the benefit of the school fund."

The bill avers that the trustees who undertook to make this lease assumed to act under the authority of chapter 63, page 76, of the Acts of the legislature of 1881. This act is as follows:

"An act to authorize the trustees of Carrick Academy

to lease the academy property to the trustees of the Winchester Normal College.

"Section 1. Be it enacted by the general assembly of the State of Tennessee, that the trustees of Carrick Academy are hereby authorized to lease the academy property to the trustees of the Winchester Normal College for a period not exceeding fifty years.

"Sec. 2. Be it further enacted, that if the lease is made it shall be the duty of the trustees of said college to keep the property in good condition and free from all debt or incumbrance of any kind, and a failure to comply with these requirements shall render the lease null and void."

A copy of the lease, executed in accordance with the provisions of this act is made an exhibit to the bill, and upon examination it is found that in its provisions it conforms to the requirements of the act in every respect. So that in general terms it may be said that, if the legislature had the right to pass this act, there has been a proper execution of the authority conferred therein.

The complainants, however, as has been said, impeach this lease, and rest their right to relief on four grounds, which are thus stated in the brief submitted by their counsel: "(1) That the lease complained of was void and of no effect, because there was no consideration for the contract. (2) That all of the trustees of Carrick Academy who signed and executed the lease contract were also trustees of the lessee, the Winchester Normal College. (3) That a corporation cannot transfer

property held by it in trust if the conveyance would be in violation of the rights of the beneficiary. (4) That chapter 63, page 76, of the Acts of 1881, which undertook to authorize the trustees of Carrick Academy to lease to the Winchester Normal College the property of the academy, is unconstitutional and void."

To a proper understanding of the conclusion reached by us a short resume of the conditions that led to the creation of the corporation represented by complainants, as well as of the act so creating it, and of the course of legislation dealing with institutions of its class, is essential. This resume, in so far as it is historic in character, while a matter of common knowledge, is, for the purpose of this opinion, taken from the bill of complainants.

It is therein averred that: "After the admission of the State of Tennessee to the union, and in 1799, a dispute arose between the State and the United States as to which had the right to dispose of the vacant and unappropriated lands in the State. In the meantime the State of North Carolina continued to issue warrants and perfect titles to lands in Tennessee in the same manner as if no cession had been made.

"Tennessee denied the right of the State of North Carolina to do this. In 1803 the legislature of Tennessee appointed an agent for the purpose of setting the difference between North Carolina and Tennessee by friendly adjustment. The negotiation between this agent and the representative of North Carolina resulted

in an agreement by which the State of Tennessee was authorized to perfect titles to lands reserved to North Carolina by the act of cession, subject to the assent of congress.

"Congress gave its assent to the agreement between the two States, and entered into a compact settling the controversy between the United States and Tennessee by an act approved April 18, 1806, chapter 31 (2 Stat., 381). Under the terms of this compact the State of Tennessee ceded to the United States certain territory described under the act. The United States ceded to Tennessee the lands east and north of the congressional line, subject to the following conditions: (1) That Tennessee should satisfy all North Carolina land claims out of the territory ceded to it. (2) It should appropriate 100,000 acres, to be located in one entire tract, for the use of two colleges, one in east and one in west (middle) Tennessee. (3) It should appropriate 100,000 acres in one entire tract for the use of academies, one in each county of the State. (4) It should, in issuing grants and perfecting titles, allow 640 acres to every six square miles in the territory ceded to it where existing claims would allow the same, which should be appropriated for the use of schools forever. (5) That the college and academy lands should not be sold for less than two dollars per acre."

It is thus seen that at this early day the congress of the United States out of the splendid domain ceded to the State provided munificently for public education,

and it may be said that, if the State had acted as a wise trustee in the management and appropriation of the property set apart for this purpose, the most beneficent results might have resulted therefrom to the citizens of the State. That the condition imposed by this cession act was accepted by the State in good faith is apparent from the legislation that immediately ensued. For the purpose of carrying out the policy to promote education in the State in accordance with this condition, two colleges were incorporated and established, and on the thirteenth of September, 1806, the legislature at the same session passed an act entitled "An act to establish academies in several counties of this State and for the appointment of trustees thereof." By this act, twenty-seven academies were incorporated, one for each of the then existing counties of the State. As a sample of the incorporating clauses as found in this act, we give that contained in the first sentence of the first section, which is in these words: "Section 1. Be it enacted by the general assembly of the State of Tennessee that Daniel Perkins, John Sappington, Nicholas T. Perkins, Chapman White and Abraham Maury, Sr., shall be and they are hereby created a body politic and corporate to be known by the name of the trustees of Harpeth Academy in the county of Williamson."

By the terms found in other sections of the act the trustees were empowered to acquire and dispose of property as "might seem to them most advantageous for the said academies, to sue and to be sued and to estab-

lish by-laws, rules and ordinances not contrary to the laws and constitution of the State as they shall deem necessary for the good government of the academies." It is further provided that "upon the death, resignation or other legal disability of any said trustees hereby or which may be hereafter appointed, the vacancy thereby occasioned shall be supplied by the next or any succeeding general assembly after such vacancy may occur." Vol. 1, p. 931 (Scott's Ed.), Laws of Tenn.

Afterwards the legislature, at its session in 1809, passed an act incorporating, with others, "The Trustees of Carrick Academy," which is in these words:

"Be it enacted by the general assembly of the State of Tennessee, that . . . Wm. Meckliff, Jas. Hunt, Jas. Cunningham, Richard Colburn, Christopher Butler and George Taylor shall be and they are hereby constituted a body politic and corporate to be known by the name of the trustees of Carrick Academy of the county of Franklin. . . .

"Sec. 2. Be it enacted that the trustees of each of the academies aforesaid and their successors by the name aforesaid shall have the same powers, prerogatives and immunities and be subject to the same rules, regulations and restrictions that are given to and prescribed for the trustees of the academies of the other counties of this State by the act to establish academies in the several counties of this State and for the appointment of trustees thereof, passed September 13, 1806."

This act is chapter 109 of the Acts of 1809, volume 1

(Scott's Ed.), Laws of Tenn., p. 1198.   The bill of complainants alleges that the college lands were disposed of from time to time agreeable to the act of congress . . . and the funds arising from the sales were applied to the building, equipment, and maintenance of two colleges, . . . and in like manner the funds arising from the sale of the academy lands were prorated among the academies as contemplated by the act of congress and the legislature of Tennessee.

It will thus be seen that in the strictest sense by its donation the State was the "founder" of these corporations, and they were created without shareholders or named beneficiaries.   There is certainly nothing in the act of incorporation which gives to the taxpayers of the respective counties in which these academies were located any right in their administration while going, or to the proceeds of the sale of their properties upon their demise.   And this is equally true as to the school children of the several counties.   While these academies were established by the State as training schools for the children of these counties, they are not either expressly or by necessary implication made *cestuis que trust.*

What, then, were these corporations?   We have no doubt that the legislature creating them supposed them to be, as well as subsequent legislatures in dealing with them assumed, they were mere educational agencies of the State to accomplish the design foreshadowed by the condition in the cession agreement already referred to.

The history of the legislation with regard to them shows this clearly.

The legislature in the original act reserved to itself the right to elect trustees from time to time, and to fill all vacancies occurring in the persons of the trustees, and it exercised this right until by an act passed in 1816 it devolved this duty on the several county courts of the State. This act is chapter 137, and is found on page 393 of the second volume of Scott's edition of the Laws of Tennessee.

As further illustrating the control which the legislature exercised over these institutions, .we refer to an act passed during the session of the legislature when the trustees of Carrick Academy were incorporated, and only eight days thereafter; this being chapter 52, and found on page 1160 of Scott's edition, which is in words and figures following:

"First. Be it enacted by the general assembly of the State of Tennessee, that from and after the passage of this act no student shall be expelled from any or either of the . . . academies in this State unless two-thirds of the trustees which have been or may hereafter be appointed to superintend said institutions may be present at the time of said expulsion, any law to the contrary notwithstanding.

"Second. Be it enacted that no student shall be suspended from the privileges he may be entitled to as much in any . . . academy in this State except there be one-half of the trustees of such institution pres-

ent and that a majority of the trustees so present shall vote for such suspension:"

And again, at the session of the legislature in 1817 an act was passed, by the fourth section of which four additional trustees were appointed to Carrick Academy. So far as can be seen from the act, it is without consultation with or consent of the trustees already appointed and exercising authority.

So it will be observed that the legislature not only increased at its pleasure the number of trustees of Carrick Academy, but that it undertook to regulate the internal discipline of all the academies created by these various acts. So, if there be anything in contemporaneous construction or implied legislative exposition, it may be asserted with great confidence that these academies were public institutions, and regarded as such from their creation.

In fact, so absolute has been the assertion of this right of legislative control that we find at least fifty-six acts passed at different times directing the sale, exchange, or lease of the properties of the several academies chartered as was this, under the authority of which much corporate property has changed hands, and, so far as we are advised, this is the first case in which the right of the legislature to pass such acts has been called in question.

The predicate upon which the complainants rest their attack upon the act authorizing the lease to the Winchester Normal College is that Carrick Academy was a

private corporation, created to administer a trust for the benefit of the taxpayers and school children of Franklin county.

In order to determine whether this assumption is sound, it is necessary to ascertain briefly the nature of corporations. While it is true there may be a corporation sole, yet the law has ordinarily to deal with the corporation aggregate, which is a collection of a few or many individuals united in a single body under a special name, endowed with the capacity of acting as one person. Such a creature is purely artificial, existing only in contemplation of law, and can neither employ its franchises nor hold its property for its own benefit. Such a corporation may be considered as a body of individuals having collectively faculties and capacities which they can employ for their own benefit or for the benefit of others, according to the purposes for which these faculties and capacities were bestowed. It is apparent that all beneficial interest both in the franchises and the property of corporations must be considered, when these corporations are reduced to their last analysis, as vested in natural persons—either in the people at large or in individuals. It is in this view that they are divided into public and private corporations.

Private corporations are those created for the immediate benefit and advantage of the individuals constituting them, and the franchises conferred are to be exercised for their advantage. The corporation stands to them in the relation of trustee holding the property

owned by it for, and dividing the profits arising from its management and the employment of its franchises for, these individuals as *cestuis que trust*.   Upon the other hand, public corporations are created for public purposes, and the property controlled by them is devoted to the objects for which they are created.  The corporators have no private beneficial interest either in the franchises granted or the property controlled.  The only private right which an individual can have in such a corporation is the right of being and acting as a corporator.  So far as the property of the corporation is concerned, the interest which the corporators have as individuals is that common interest which all citizens have in property belonging to the State.  Nor is the character of this interest affected by the source from which the property comes.  A purchase by or a gift of property to the corporation is in reality a purchase by or a gift to the public, and is to be administered by the corporation as an agency of the State.

These distinguishing features, as well as the rules for the government of these two classes of corporations, are announced in the standard text-books, and in many reported cases, which it is unnecessary to cite.

These being the distinctive marks of private and public corporations, we think there is no difficulty in assigning the corporation in question to its proper place among the latter.

As has been seen, it had no shareholders and earned no profits in which its corporators had an interest.   It

was evidently organized for a public purpose. It was purely one of the educational agencies of the State, created for the diffusion of knowledge in the various communities where located. The legislation out of which sprang this and the other academies of like nature, however crude, was the first effort of the State to bring education to the door and within the means of every citizen of the commonwealth. It was the beginning of a long series of efforts, which were often abortive, but as often renewed, to establish a public school system in the State; and that which we have to-day can be historically traced to the initial acts of 1806 and 1809.

Being public agencies established by the State to subserve a public purpose, we see no more reason to doubt the power of the legislature to pass the act in question than to enact legislation to create and destroy municipalities, and to exercise control at its pleasure over the various benevolent institutions and their properties established throughout the State.

This is no new question in this State. In 1836 the legislature created a body politic and corporate by the name and style of the "Board of Commissioners of Common Schools," and authorized it to "hold and possess property of any kind in trust for the use of the common schools," and to "do and execute all acts which a corporation or body politic in law" could "lawfully do and execute." A controversy subsequently arose between the corporation and one McEwen, the superintendent of public instruction, and who, as an officer of the board,

had charge of its funds, and the sureties on his bond, as to alleged maladministration of his trust. While this controversy was pending the general assembly adopted a resolution by which a commission was provided with authority to compromise and settle with the sureties of McEwen, who were sought to be held liable for his alleged mismanagement "upon principles of right and justice, and to the best interest of the school fund." A compromise agreement was made, and submitted to the court where the controversy was pending, and it was there combated by the counsel representing the board upon the ground urged by complainants in the present case that this legislative act was an unconstitutional interference with the franchises conferred by the act of incorporation upon the board. This insistence, however, was not sustained, the court holding in express terms that the corporation in question was a public agency, and as such under the control of the legislature. Speaking through Judge Turley, the court said: "Such public corporations are made for public convenience. No private rights are involved in them, and therefore the legislature, in interfering with them, is in no danger of violating the obligations of contract or public faith, and, although it may have thought proper to delegate a portion of its own legitimate power to such corporation for the public benefit, yet the same may be resumed at any time and exercised temporarily by the legislature at its discretion, or the corporation may at any moment

be deprived of it altogether. The *Governor* v. *McEwen*, 5 Hum., 241."

If this holding needed support it is to be found abundantly in the opinions of courts of last resort outside of this State. In 1826 (Acts 1826, p. 35) the legislature of Alabama created a corporation known as the "Mobile School Commissioners." The funds of this corporation were to be derived wholly from the bounties of the State and the United States and from certain revenues accruing to the treasury of the county from fine, forfeiture, etc., "all of which were set apart as a fund, not for the benefit of the commissioners, but as a special fund for the endowment and support of schools in said county." Of this corporation, in *Mobile School Commissioners* v. *Putnam,* 44 Ala., 506, the court said: "There was neither stock nor shareholders; nor was any consideration paid by them, nor by any other person, for the charter of incorporation, if such it can be properly called. It was wholly a matter of public concern, and for public benefit, and consequently nothing in the nature of a contract was created between the State and said commissioners or the people of the State and county of Mobile either as a body corporate or as individuals. It was, and was intended to be, in all its essential characteristics and attributes a public institution or corporation created for public purposes, and therefore subject to be altered, amended, or even repealed by the legislature." The same view was announced in *Trustees of the University* of *Alabama* v.

*Winstead,* 5 Stew. & P., 17, in these words: "If the property possessed by a corporation is altogether the property of the State; if the corporation have paid nothing amounting to a valuable consideration for the act of incorporation; in fine, if there is no contract upon valuable consideration between the State and the corporators—it is a public corporation, and, if it is public, it is certainly within the complete control of the general assembly."

In *Head* v. *Curators of Missouri,* 47 Mo., 224, it appears that the University of Missouri was established by the State. Private citizens of Boone county, in order to secure its location, subscribed $108,000 for its use, and an institution known as Columbia College gave to it its building and apparatus, valued at $10,000. The supreme court of Missouri, with reference to the legal status of that university, said: "But these contributions to the building fund did not constitute the contributors founders of the university. Nor did the contributions alter the nature of the foundation, or change the character of the corporation. *University of N. C. v. Maultsby,* 43 N. C. 257. Between this and the Dartmouth College case and the cases following that decision there is a broad distinction, viz., the difference that exists between the public institution of the State and a private corporation. The State entered into no compact with private parties. The State established an institution of its own, and provided for its control and government through its own agents and

bounties. The act creating the institution in its first section declares that a university is hereby instituted in this State, the government whereof shall be vested in a board of curators. The university is then declared a corporation and body politic, and vested with certain powers. These powers are given into the hands of a board, which was made subject to the pleasure of the legislature. This is not the way in which a private corporation is brought into being and endowed with corporate franchises. A private corporation involves the idea of private parties and private rights. No such parties or rights were concerned in the institution of the University of Missouri. By establishing the university the State created an agency of its own, through which it proposed to accomplish certain educational objects. In fine, it created a public corporation for educational purposes, a State university."

To like effect is *State of Florida, ex rel.,* v. *Knowles,* 16 Fla., 577.

The court of chancery appeals adopted the view insisted upon by the complainants, and rested their conclusion upon the authority of the case of the *Trustees of Dartmouth College* v. *Woodward,* 4 Wheat., 519, 4 L. Ed., 629. We think, however, that court misapplied that case, as an examination of the opinion of the court, delivered by Chief Justice Marshall, will disclose. In that opinion it was distinctly conceded that, if the corporation there in question was a political agency, then it was subject to legislative control, and no complaint

could be made of the act of the legislature of New Hampshire which undertook to make material changes in the organization and methods of the institution. The court, however, found that Dr. Wheelock who was treated as a founder of Dartmouth College, "acting for himself and for those who at his solicitation had made contributions to his school, applied for this charter as the instrument which should enable him and them to perpetuate their beneficent intention. It was granted, and an artificial immortal being was created by the crown capable of receiving and distributing forever, according to the will of the donors, the donations which should be made to it. On this being the contributions which had been collected were immediately bestowed. These gifts were made not indeed to make a profit for the donors or their posterity, but for something, in their opinion, of inestimable value; for something which they seemed to think fully equivalent for the money with which it was purchased. The consideration for which they stipulated is the perpetual application of the fund to its object in the mode prescribed by themselves."

Upon these facts it was held that Dartmouth College was a private eleemosynary corporation, and that its charter was "plainly a contract to which the donors, the trustees, and crown (to whose rights and obligations New Hampshire succeeds), were the original parties. It is a contract made on a valuable consideration. It is a contract for the security and disposition of property. It is a contract on the faith of which real and

personal estate has been conveyed to the corporation. It is, then, a contract within the letter of the constitution. . . ."

It is easy to see that the corporation styled the "Trustees of Carrick Academy" finds no analogy to the one that was the subject of consideration in that case. So it is upon principle as well as upon authority we hold that this corporation was a public agency under the control of the State, and that the act of the legislature under which the lease of its property to the Winchester Normal College was made in 1881 was constitutional. This holding relieves us from considering the minor objections made to the lease by the complainants in their bill.

It follows that the court of chancery appeals, holding otherwise, was in error, and its decree is reversed, and the bill of complainants is dismissed, at their cost.