The **UNIVERSITY OF TENNESSEE, Plaintiff,**

v.

**UNITED STATES FIDELITY & GUARANTY COMPANY, Defendant.**

**No. Civ. 3–87–237.**

United States District Court, E.D. Tennessee, N.D.

June 12, 1987.

On Motion to Remand Sept. 18, 1987.

Beauchamp Brogan, Knoxville, Tenn., Albert E. Phillips, Atlanta, Ga., for plaintiff.

Jack B. Draper, Knoxville, Tenn., Luther Ott, Jackson, Miss., for defendant.

### MEMORANDUM

JARVIS, District Judge.

*Factual Background*

On March 6, 1987, The University of Tennessee ["UT"] filed this action in the Circuit Court for Knox County, Tennessee, at Knoxville ["Circuit Court"] against a surety,* United States Fidelity & Guaranty Company ["USF & G"], in connection with construction of the Assembly Center and Arena ["the Arena"] on the campus of UT. On April 3, 1987, USF & G filed a petition to remove the action to this Court on the basis of diversity of citizenship. [*See* Doc. 1].

On May 13, 1987, UT filed a motion to remand the case to the Circuit Court pursuant to 28 U.S.C. § 1447, alleging that the Court lacks original jurisdiction of the subject matter of this case because: (1) there is no federal question raised in this action; and (2) there is no diversity between citizens of different states. [*See* Doc. 5]. In response, USF & G filed a motion for a protective order and for an extension of time for responding to UT's motion to remand, requesting that the Court: (1) limit discovery to matters related to the issue of the subject matter jurisdiction of the Court; (2) enlarge the time period for serving USF & G's response to UT's motion to remand until ten days after discovery on the question of subject matter jurisdiction is completed; and (3) enlarge the time period for serving USF & G's answers and objections to UT's written discovery requests until 30 days after entry of an order by the Court resolving the issue of subject matter jurisdiction. [*See* Doc. 7]. Because the Court viewed USF & G's motion [Doc. 7] as a means by which to limit discovery rather than to expand it, the Court granted USF & G's entire motion on May 21, 1987 [*see* Doc. 9] before the time had run for UT to file a response to USF & G's motion. *See* Rule 6(a), (c), Fed.R.Civ.P., and Local Rule 12(b).

Accordingly, on May 28, 1987, UT filed a motion for reconsideration requesting that the Court vacate its order of May 21, 1987. [*See* Doc. 11]. USF & G timely responded to UT's motion on May 29, 1987, and oral argument was heard by the Court on that

---

* USF & G's principal is B.B. Andersen Construction Co., Inc. of Topeka, Kansas, the original general contractor for the Arena.

same day. [*See* Doc. 12]. Supplemental briefs have now been filed and have been carefully considered by the Court. [*See* Docs. 13 and 14].

### *Arguments*

The basis of UT's motion for remand is that UT is an arm or *alter ego* of the State of Tennessee and thus cannot be a citizen for diversity purposes, thereby destroying this Court's subject matter jurisdiction. UT maintains that this determination is solely one of law for the Court. Thus, further factual discovery is not necessary for USF & G to respond to UT's motion for remand. Therefore, UT argues that this Court's order of May 21, 1987, should be vacated since it allows unnecessary discovery to continue. USF & G responds, however, that a determination as to whether UT is an arm or *alter ego* of the State is a "mixed question of fact and law" so that limited discovery is entirely appropriate and necessary. In order to resolve this discovery dispute between the parties, it will be necessary for the Court to touch, in part, upon the merits of UT's motion for remand since a resolution of both motions, *i.e.*, UT's motion for remand and UT's motion to prevent further discovery (by vacating the May 21, 1987 Order) are inextricably intertwined.

### *Law and Analysis*

It is well settled that a State is not a "citizen" for purposes of diversity jurisdiction under 28 U.S.C. § 1332. *See, e.g., Moor v. County of Alameda*, 411 U.S. 693, 717, 93 S.Ct. 1785, 1800, 36 L.Ed.2d 596 (1973); *Postal Telegraph Cable Company v. Alabama*, 155 U.S. 482, 487, 15 S.Ct. 192, 194, 39 L.Ed. 231 (1894). It is equally well settled that "a political subdivision of a State, unless it is simply the arm or *alter ego* of the State" is a citizen of the State for diversity purposes. *Moor*, 411 U.S. at 717, 93 S.Ct. at 1800. Moreover, the question whether a particular entity is an arm or *alter ego* of the State for purposes of diversity jurisdiction is purely a question of federal law. *See Hughes-Bechtol, Inc. v. W. Virginia Bd. of Regents*, 527 F.Supp. 1366 (S.D.Ohio 1981), *aff'd*, 737 F.2d 540,

543 (6th Cir.1984), *cert. denied*, 469 U.S. 1018, 105 S.Ct. 433, 83 L.Ed.2d 359 (1984); *Long v. Richardson*, 525 F.2d 74, 79 (6th Cir.1975). The precise question presently before the Court is whether the Court can determine that UT is or is not the arm or *alter ego* of the State for diversity purposes purely as a matter of law (as UT maintains) or as a mixed question of law and fact (as USF & G maintains), thereby requiring further factual discovery.

In support of its position, USF & G relies heavily on *Soni v. Board of Trustees of University of Tennessee*, 513 F.2d 347 (6th Cir.1975), *cert. denied*, 426 U.S. 919, 96 S.Ct. 2623, 49 L.Ed.2d 372 (1976). In *Soni*, the Sixth Circuit decided that, assuming that UT is a state agency within the meaning of the Eleventh Amendment, the State of Tennessee had waived its right to assert the defense of sovereign immunity in suits brought against UT in federal court because the Tennessee statutory scheme allowed UT to sue and be sued in all courts. In particular, USF & G relies on the following language from *Soni:*

> We are uncertain whether the University of Tennessee is a state instrumentality protected by the Eleventh Amendment. The record before us contains little data on the University's financial relationship with the State of Tennessee, and the Tennessee cases and statutory materials do not compel a conclusion one way or the other.

*Id.* at 352.

However, the Court would note that the effect of *Soni* was abrogated by the Tennessee General Assembly in 1977 when the State's Sovereign Immunity Statute was amended by the addition of the following language:

> No statutory or other provision authorizing the University of Tennessee and its board of trustees to sue and be sued shall constitute a waiver of sovereign immunity.

*Tennessee Code Annotated* § 20–13–102(b). Moreover, as Judge Wellford noted in *Gross v. University of Tennessee*, 448 F.Supp. 245 (W.D.Tenn.1978), *aff'd*, 620

F.2d 109 (6th Cir.1980), "subsequent decisions of the Sixth Circuit cast some doubt ... as to the continued vitality of *Soni.*" *Id.*, 448 F.Supp. at 247–48 (*citing Martin v. University of Louisville*, 541 F.2d 1171 (6th Cir.1976); *Long v. Richardson*, 525 F.2d 74). Finally, the Court would emphasize that the *Soni* court dealt with whether or not UT was an arm or *alter ego* of the State for Eleventh Amendment purposes—not for diversity of citizenship purposes.

USF & G also relies heavily on *Hall v. Medical College of Ohio at Toledo*, 742 F.2d 299 (6th Cir.1984), in support of its position that a determination as to whether UT is a citizen for diversity purposes requires the application and balancing of numerous factual and legal questions. USF & G specifically points to the "nine-point analysis employed by the Third Circuit in *Blake v. Kline*, 612 F.2d 718 (3rd Cir.1979), *cert. denied*, 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1112 (1980)," which was adopted by the *Hall* court. This Court does not deem it necessary, however, to enumerate and discuss each of the nine factors because the Court would distinguish the test set forth in *Hall*, like the discussion in *Soni*, as one which pertains solely to determining whether some entity is an arm, agency or *alter ego* of the State for Eleventh Amendment purposes—not for diversity of citizenship purposes. The Court recognizes, nevertheless, that other courts have employed the same considerations to determine whether an entity is the agent or *alter ego* of the state for Eleventh Amendment purposes as it has for diversity of citizenship purposes. *See Roberson v. Dale*, 464 F.Supp. 680, 686, n. 12 (M.D.N.C. 1979).

In addition to pointing out that USF & G's reliance in *Hall* and *Soni* is somewhat misplaced because those cases turn on Eleventh Amendment considerations *per se*, the Court would remind the parties that this Court has already held that, in an Eleventh Amendment situation, UT is an agency of the State and is immune from suit except to the extent it has consented to be sued. *See Carlson v. Highter*, 612 F.Supp. 603 (D.C.Tenn.1985). In making that determination, the Court examined

only Tennessee case law and the Tennessee statutory scheme. *See id.* at 605. It was not necessary, however, for the parties to undertake an extensive factual investigation in order for the Court to decide that case because of the clarity of the Tennessee cases and the Tennessee statutes.

Finally, USF & G relies in part on *Julien v. Sarkes Tarzian, Inc.*, 352 F.2d 845 (7th Cir.1965), for the proposition that the Court's determination of UT's status as a citizen for diversity purposes is "a mixed question of law and fact, but mainly of fact." *See id.* at 847. However, as counsel for UT correctly points out, the *Julien* case involves the issue as to whether plaintiff was a citizen of Connecticut or Indiana. Because plaintiff was an individual, plaintiff was undeniably a citizen of some state, and therefore a factual determination was entirely appropriate to determine plaintiff's citizenship. In contrast, the issue before the Court is not whether UT is a citizen of Tennessee as opposed to some other state; rather, the issue is whether UT is a citizen at all for diversity purposes.

■ However, a review of some of the cases relied on by UT compels the Court to conclude that it is necessary only for this Court to examine state law—not fact—in order to determine whether or not UT is an arm or *alter ego* of the State which will, in turn, determine whether the Court should remand this case to the Circuit Court. In *Moor v. County of Alameda*, the Supreme Court made a detailed examination of the relevant provisions of California law in determining that the County of Alameda was not an arm or *alter ego* of the State, but rather occupied an independent status and was therefore a "citizen" for diversity purposes. *Id.* 411 U.S. at 719–20, 93 S.Ct. at 1800–01. The Court did not need to examine any "facts" in reaching its decision.

Similarly, in *Hughes-Bechtol, Inc. v. West Virginia Board of Regents*, 527 F.Supp. 1366 (S.D.Oh.1981), *aff'd.* 737 F.2d 540 (6th Cir.1984), *cert. denied*, 469 U.S. 1018, 105 S.Ct. 433, 83 L.Ed.2d 359 (1984), the Sixth Circuit affirmed the District Court's finding that the West Virginia

Board of Regents is an agency or *alter ego* of the State of West Virginia, rather than a citizen thereof under West Virginia law. More importantly, the Sixth Circuit examined West Virginia *law* in order to determine whether the Board of Regents in question was an agency or *alter ego* of the State for purposes of diversity jurisdiction. In particular, the Court found:

> The Constitution, statutes and federal case law of West Virginia, as well as the undisputed facts, are dispositive of the status of the Board as an agency and alter-ego of the State, and of the absence of diversity jurisdiction in this case.

*Id.* at 544. The above language is not the first instance in which the Sixth Circuit has declared that the independent or *alter ego* status of a political subdivision is generally determined by examining state law. *See Lenoir v. Porters Creek Watershed District*, 586 F.2d 1081, 1089, n. 9 (6th Cir. 1978). USF & G distinguishes the *Hughes-Bechtol* case, in part, from the case *sub judice* because the Court in *Hughes-Bechtol* was dealing with "undisputed facts". *See Hughes-Bechtol*, 527 F.Supp. at 544. In the instant case, USF & G maintains that numerous factual determinations remain to be resolved.

### Conclusion

The Court concludes, nevertheless, that all of the relevant facts necessary to decide UT's motion for remand will be undisputed for purposes of applying them to the relevant Tennessee case law and the applicable Tennessee statutory scheme to determine whether UT is the arm or *alter ego* of the State of Tennessee for diversity of citizenship purposes. At least, the Court would like the opportunity to make this determination without the necessity of protracted and arguably endless discovery which could overshadow the real issues involved in this case.

The Court finds that the prompt resolution of the issues involved in UT's motion for remand can be accomplished without the necessity of USF & G sorting through 180 years of documents to trace UT's origins and without the necessity of USF & G exploring the financial arrangements regarding the Arena. The Court concludes, like UT, that, "Whatever the law is, it is," [*see* Doc. 11, p. 5] so that any further discovery is unnecessary at this time.

Order accordingly.

### ORDER

For the reasons set forth in the Memorandum Opinion this day passed to the Clerk for filing, it is hereby ORDERED that plaintiff's motion for reconsideration [Doc. 11] be, and the same hereby is, GRANTED whereby this Court's Order [Doc. 9] entered on May 21, 1987, is hereby VACATED whereby defendant shall now have twenty (20) days from the date of this Order within which to respond to plaintiff's motion for remand to state court [Doc. 5].*

It is further ORDERED that all discovery be, and the same hereby is, STAYED until the Court can rule on plaintiff's motion for remand [Doc. 5] except to the extent that the parties have agreed to such discovery or the Court otherwise orders.

### MEMORANDUM OPINION

### ON MOTION TO REMAND

#### Background Information

On March 6, 1987, the University of Tennessee ["UT"] filed this action in the Circuit Court for Knox County, Tennessee, at Knoxville ["Circuit Court"] against United States Fidelity & Guaranty Company ["USF & G"] in connection with construction of the Assembly Center and Arena ["the Arena"] on the Knoxville campus of UT. USF & G is the surety for B.B. Andersen Construction Company, Inc. of Topeka, Kansas, the original general contractor for the Arena. On April 3, 1987, USF & G filed a petition to remove the action to this court on the basis of diversity of citizenship. [*See* Doc. 1]. This matter is presently before the court on UT's motion

---

* Plaintiff, of course, will have the usual amount of time to respond to defendant's response to its

motion for remand. *See* Local Rule 12(b) and Rule 6(a), (e), Federal Rules of Civil Procedure.

to remand the case to Circuit Court, in which UT alleges that the court lacks original jurisdiction of the subject matter of this case. Defendant has responded, and oral argument was heard by the court on September 1, 1987.

The basis of UT's motion for remand is that UT is an arm or *alter ego* of the State of Tennessee and thus cannot be a citizen for diversity purposes, thereby destroying this court's subject matter jurisdiction. Consequently, UT maintains that this action, being improvidently removed, should be remanded to the Circuit Court for trial. In the event that this court grants UT's motion, UT further requests the payment of "just costs", including attorney fees, pursuant to 28 U.S.C. § 1447(c). USF & G, on the other hand, maintains that UT is a citizen of the State of Tennessee for diversity purposes and therefore the jurisdiction of this court has been properly invoked.

*Law and Analysis*

As was pointed out in this court's earlier memorandum opinion [Doc. 15] entered on June 12, 1987, it is well settled that a state is not a "citizen" for purposes of diversity jurisdiction under 28 U.S.C. § 1332. *See, e.g., Moor v. County of Alameda,* 411 U.S. 693, 717, 93 S.Ct. 1785, 1800, 36 L.Ed.2d 596 (1973); *Postal Telegraph Cable Company v. Alabama,* 155 U.S. 482, 487, 15 S.Ct. 192, 194, 39 L.Ed. 231 (1894). It is equally well settled that a "political subdivision of a State, unless it is simply the arm or *alter ego* of the State" is a citizen of the state for diversity purposes. *Moor,* 411 U.S. at 717, 93 S.Ct. at 1800. Moreover, the question of whether a particular entity is an arm or *alter ego* of the state for purposes of diversity jurisdiction is purely a question of federal law. *See Hughes-Bechtol, Inc. v. West Virginia Board of Regents,* 527 F.Supp. 1366 (S.D.Ohio 1981), *aff'd,* 737 F.2d 540, 543 (6th Cir.1984), *cert. denied,* 469 U.S. 1018, 105 S.Ct. 433, 83 L.Ed.2d 359 (1984); *Long v. Richardson,* 525 F.2d 74, 79 (6th Cir.1975). The independent or *alter ego* status of a political subdivision is generally determined by examining state law. *See Moor,* 411 U.S. at 718–19, 93 S.Ct. at 1800. Therefore, in

order to determine whether UT is the arm or *alter ego* of the State of Tennessee for diversity purposes, the court must focus on the Constitution, statutes, and federal and state case law of Tennessee. *See Hughes-Bechtol,* 737 F.2d at 544.

UT is an entity created by enactments of the Tennessee General Assembly and its Knoxville campus is established as the premier research and graduate study campus for the State of Tennessee. 1807 Tenn. Pub.Acts ch. 64; 1839–40 Tenn.Pub.Acts ch. 98. *Tennessee Code Annotated* devotes an entire chapter to the creation, organization and state-wide responsibilities of UT. *See* T.C.A. § 49–9–401, *et seq.* (1983). T.C.A. § 49–9–901 establishes UT at Chattanooga; T.C.A. § 49–9–1001 establishes UT at Martin; T.C.A. § 49–9–701 establishes UT at Memphis as the medical and research science campus; T.C.A. § 49–9–202 establishes state-wide clinical medical education centers operated by the Memphis medical campus and the UT Memorial Research Center and Hospital, located in Knoxville and established by 1949 Tenn. Pub.Acts ch. 154; T.C.A. § 49–9–601 establishes the UT Space Institute at Tullahoma which offers degrees in aerospace science and engineering; T.C.A. § 49–9–703 establishes state-wide family practice residency programs to be administered by UT's College of Medicine; and T.C.A. § 49–9–401 establishes UT's institute for public service with state-wide responsibility for research and technical assistance to state and local governments and industry.

That statutory scheme further provides that UT's financial affairs be closely monitored by the legislature. For example, UT's Board of Trustees is required to present an annual report to the governor, including a detailed statement of UT's receipts and expenditures. T.C.A. § 49–9–208. Other statutory provisions also control certain facets of UT's financial operations. State funds in UT's custody are regularly audited by the State Comptroller, and such audits examine all receipts and expenditures, regardless of source. T.C.A. § 4–3–304; T.C.A. § 8–4–109. UT is accountable to the State for compliance with

State Comptroller regulations and directives. T.C.A. § 8–4–109. Additionally, all revenues received by UT from any source are deposited in a single co-mingled bank account, as authorized by the legislature. T.C.A. § 9–4–303 (1987).

The legislature also exercises authority over: (1) UT's compensation of employees, *see generally*, 1986 Tenn.Pub.Acts ch. 937, § 35; (2) maintenance and operations of UT's physical plants, *see id.*, Item 3; and (3) tuition fee charges, *see id.*, Item 5.

More importantly, in 1977 the Tennessee legislature clearly declared its intent that the funds of UT are to be protected by the State's sovereign immunity statute by amending it with the following language:

> No statutory or other provision authorizing the University of Tennessee and its Board of Trustees to sue and be sued shall constitute a waiver of sovereign immunity.

T.C.A. § 20–13–102(b). Even more recently, the Tennessee legislature has emphasized the restriction upon UT's authority to pay judgments:

> Except where sovereign immunity has been or shall hereafter be expressly waived by the General Assembly, all appropriations of state funds and institutional revenues made in this Act and prior Acts to institutions of higher education shall be state funds and shall be protected by the state's sovereign immunity from any court's judgment [sic], decree, attachment, or other legal process, provided that any statutory or other provision authorizing any entity to sue and be sued shall not constitute a waiver of sovereign immunity.

1986 Tenn.Pub.Acts ch. 937, § 35, Item 8. Absent waiver of sovereign immunity, Article II, § 24, of the Tennessee Constitution prohibits expenditure of public money except by lawful appropriation.

Further legislative control of UT by the State is reflected by the manner in which it controls the appointment of the board of trustees of UT. *See* T.C.A. §§ 49–9–201, *et seq.* In particular, the Tennessee General Assembly requires that the governor, as well as the commissioner of agriculture and

the commissioner of education be voting members of UT's board of trustees. T.C.A. § 49–9–201. The remaining 18 appointed voting trustees are appointed by the governor subject to confirmation by the senate. T.C.A. § 49–9–202 (Supp.1987). Apparently because UT performs its educational function on a state-wide basis, the legislature requires that at least one trustee be appointed from each congressional district in the state. *Id.* Legislative control is also exhibited in many other aspects of UT's operation. *See, e.g.*, T.C.A. §§ 12–2–115; 12–3–103 (leases); 12–2–112 (dispositions of surplus property); 12–4–109–12–4–110 (personal services contracts); 49–7–201 (higher education commission); and 9–8–109(b) (contribution to claims commission).

Finally, it is important to note that UT is fully tax exempt without any reservation. T.C.A. § 67–5–203(2) (Supp.1987). In contrast, property owned by private schools is tax exempt only if used for educational purposes. T.C.A. § 67–5–212 (Supp.1987). It appears to the court, therefore, that UT is subject to tax rules different to those applicable to private colleges and universities because of UT's status as a state agency. It would also appear that UT enjoys this exemption solely because it is part of the State, and its property belongs to the State. *See LaManna v. University of Tennessee*, 462 S.W.2d 877, 881 (Tenn.1971). Such tax exempt status is an obvious indication of UT's *alter ego* character. *Accord, Roberson v. Dale*, 464 F.Supp. 680, 687 (M.D.N.C.1979).

In addition to the above statutory law of Tennessee which supports UT's position that it is an agency or *alter ego* of the State, the case law of Tennessee also buttresses UT's argument on this matter. The court believes that the decision in *University of Tennessee v. Peoples Bank*, 157 Tenn. 87, 6 S.W.2d 328 (1928), is the controlling case on UT's status. This case discusses whether UT, in a claim against an insolvent bank, could, on the basis of the state's sovereignty, assert a claim of priority against the bank on a surety bond given to secure any loss of state funds on

deposit with the bank. As stated by the court:

> The claim for preference is predicated upon the idea that the University of Tennessee is an agency of the State, and that property held and possessed by it is the property of the State, for the protection of which the State is entitled to preference and priority as an incident to its sovereignty. (Citations omitted).

*Id.*, 157 Tenn. at 90, 6 S.W.2d 328. In determining this question, the Tennessee Supreme Court specifically considered UT's incorporation "by the State of Tennessee in 1807, under the name of 'Trustees of East Tennessee College.'" *Id.* at 91, 6 S.W.2d 328. The court correctly noted that the Tennessee General Assembly—not the board of trustees—changed the name of the corporation to "The University of Tennessee". *Id.*

The court in *Peoples Bank* also reviewed the statutory scheme which governs UT pertaining to the receipt by UT of funds from state and federal appropriations, as well as from private gifts. *Id.* at 91–2, 6 S.W.2d 328. The court discussed with approval its decision in *Maryland Casualty Company v. McConnell*, 148 Tenn. 656, 257 S.W. 410 (1924), in which the court held that "money acquired by the State for school purposes is acquired for a governmental purpose, and is held by the State in its sovereign capacity." *Peoples Bank*, 157 Tenn. at 92, 6 S.W.2d 328.

Because the receiver for Peoples Bank raised a question as to whether the State, by creating UT as a corporation and placing legal title to UT property and funds under UT's name lost the right to claim sovereign control over such funds and property, the court then discussed and explained the difference between private and public corporations created by the Tennessee General Assembly. Focusing upon the sovereign nature of public corporations, the court closely compared the public corporation involved in *Trustees of Carrick Academy v. Clark*, 112 Tenn. 483, 80 S.W. 64 (1904), with the public corporation creating UT as follows:

In *Trustees of Carrick Academy v. Clark, et al.*, 112 Tenn. 483 [80 S.W. 64], this court considered the legal result of the creation by the State of a corporation styled "The Trustees of Carrick Academy." This corporation was created by Chapter 31 of the Acts of 1806 and was given corporate powers similar to those possessed by the University of Tennessee. The corporation was one of a number of similar corporations, created in that period of the history of this State, of which this court, in the case cited, said:

> "What, then were these corporations? We have no doubt that the legislature creating them supposed them to be, as well as subsequent legislatures in dealing with them assumed, that they were mere educational agencies of the State to accomplish the design foreshadowed by the condition in the Cession Agreement already referred to."

*Peoples Bank*, 157 Tenn. at 93–94, 6 S.W. 328.

USF & G asserts that a factual stipulation in *Peoples Bank*, *i.e.*, that the State was considered to be a real party in interest for the purposes of asserting the claim of preference and that the surety bond was made for the State's protection, controlled the outcome of the case so that *Peoples Bank* is "questionable authority". However, it was not stipulated in *Peoples Bank* that the State had a right to assert this claim through UT on the basis of its sovereignty and it appears to this court that the status of the county bond funds in UT's account was vigorously disputed. In this court's opinion, the Tennessee Supreme Court, in resolving these questions, settled the question as to UT's status as follows:

> ... The University of Tennessee was not created for the benefit of a particular section of the State, and the property entrusted to it by the State, is devoted to the use of the entire public, in the performance by the State of a governmental function.
>
> We are of the opinion that the State, and the public represented by it, must be considered as the owner of property held by the University, and that the sovereign character of the State's ownership is not

changed by the creation of the corporation, as a convenient means through which the State exercises a strictly governmental function of educating the youth among its citizens. We are not able to find that the State has lost or divested itself of any element of sovereignty in the creation of this corporation which is subject to the will of the legislative branch of the State Government in every particular, and the only purpose of which is to perform a governmental function.

*Peoples Bank*, 157 Tenn. at 94–95, 6 S.W. 328.

This court recognizes, however that *Peoples Bank* concerns the issue of state common law sovereign immunity as opposed to diversity or Eleventh Amendment immunity. In fact, part of this distinction was observed by the court in *Soni v. Board of Trustees of University of Tennessee*, 513 F.2d 347 (6th Cir.1975), *cert. denied*, 426 U.S. 919, 96 S.Ct. 2623, 49 L.Ed.2d 372 (1976), in which that court stated after quoting the above language from *Peoples Bank* as follows:

We have been unable to find any case discussing the University's status under the eleventh amendment.

.   .   .   .   .

We are uncertain whether the University of Tennessee is a State instrumentality protected by the eleventh amendment. The record before us contains little data on the University's financial relationship with the State of Tennessee, and the Tennessee cases and statutory materials do not compel a conclusion one way or the other.

*Id.*, 513 F.2d at 352. However, as this court noted in its earlier memorandum and order [Docs. 16, 17], entered on June 12, 1987, the *Soni* court only dealt with whether or not UT was an arm or *alter ego* of the State of Tennessee for eleventh amendment purposes—not for diversity of citizenship purposes. More importantly, the effect of *Soni* was abrogated by the Tennessee General Assembly in 1977 when the State's sovereign immunity statute was amended by the addition of the following language:

No statutory or other provision authorizing the University of Tennessee and its Board of Trustees to sue and be sued shall constitute a waiver of sovereign immunity.

T.C.A. § 20–13–102(b). The court would finally note that the decision in *Soni* contains no analysis of *Peoples Bank* after extensively quoting from it. Rather, the *Soni* court simply distinguishes the case *sub judice* from *Peoples Bank* by stating that it did not involve eleventh amendment considerations. Likewise, this court distinguishes *Soni* from the instant case since the *Soni* case does not turn on or address diversity of citizenship concerns.

Similarly, this court previously distinguished another case heavily relied on by USF & G—*Hall v. Medical College of Ohio at Toledo*, 742 F.2d 299 (6th Cir.1984)—as one which pertains solely to determining whether some entity is an arm, agency, or *alter ego* of the state for eleventh amendment purposes and not for diversity of citizenship purposes. This court also previously recognized that other courts have employed the same considerations to determine whether an entity is the agent or *alter ego* of the state for eleventh amendment purposes as it has for diversity of citizenship purposes.

Assuming, *arguendo*, that this court were inclined to employ the nine-factor test enumerated in *Hall* for eleventh amendment purposes as the correct test for diversity of citizenship purposes, this court would adopt the well-reasoned analysis employed by Judge James E. Todd in the *Jain v. University of Tennessee at Martin*, 670 F.Supp. 1388 (W.D.Tenn.1987). Judge Todd carefully considered each of the nine-factor analysis in *Hall* and concluded that the University of Tennessee at Martin ["UTM"] "is not autonomous from, and is financially dependent on, the state of Tennessee ... so that ... UTM is an arm of the state entitled to eleventh amendment immunity from suit." *Id.* at 1393. Thus,

what may be USF & G's best argument on the precise issue before this court also fails.

Finally, the court was impressed with UT's presentation during oral argument of its listing of 77 reported cases in which courts have held that universities were entitled to be considered as an agency or *alter ego* of the state for eleventh amendment purposes as opposed to nine reported cases against such a finding. *See, e.g., Harden v. Adams,* 760 F.2d 1158 (11th Cir.1985) (Troy State University); *Gay Student Services v. Texas A & M University,* 737 F.2d 1317 (5th Cir., 1984), *cert. denied and appeal dismissed,* 471 U.S. 1001, 105 S.Ct. 1860, 85 L.Ed.2d 155 (1985); *Spaulding v. University of Washington,* 740 F.2d 686 (9th Cir.1984), *cert. denied,* 469 U.S. 1036, 105 S.Ct. 511, 83 L.Ed.2d 401 (1984); *Jagnandan v. Giles,* 538 F.2d 1166 (5th Cir.1976), *cert. denied,* 432 U.S. 910, 97 S.Ct. 2959, 53 L.Ed.2d 1083 (1977) (Mississippi State University); *Long v. Richardson,* 525 F.2d 74 (6th Cir.1975) (Memphis State University); *Brennan v. University of Kansas,* 451 F.2d 1287 (10th Cir.1971). *But see, e.g., Goss v. San Jacinto Junior College,* 588 F.2d 96 (5th Cir.1979); *Kovats v. Rutgers,* 633 F.Supp. 1469 (D.N.J.1986) (Rutgers University); *Vanlaarhoven v. Newman,* 564 F.Supp. 145 (D.R.I.1983) (University of Rhode Island). Equally important is the fact that, since 1980, the trend has increased with 49 reported cases finding in favor of the *alter ego* status and three against. *See id.* Although the sheer number of cases will not always mandate the result which needs to be reached in a particular case, this factor becomes of paramount importance in the case *sub judice* for the following reasons.

First, courts have long held that the removal statute must be strictly construed so as to restrict and limit the removal jurisdiction of federal courts. *See, e.g., Shamrock Oil and Gas Corporation v. Sheets,* 313 U.S. 100, 108–09, 61 S.Ct. 868, 872, 85 L.Ed. 1214 (1941); *Wilson v. U.S. Department of Agriculture,* 584 F.2d 137, 142 (6th Cir. 1978); *Fort v. Ralston Purina Company,* 452 F.Supp. 241, 242 (E.D.Tenn.1978). Secondly, the burden of establishing the propriety of federal jurisdiction is on the party seeking removal. *See, e.g., McNutt v. General Motors Acceptance Corporation,* 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *Fort,* 452 F.Supp. at 242. Accordingly, since the removal statute must be strictly construed so as to limit federal removal jurisdiction, and because the party seeking removal must prove that his right to the federal forum is sufficient to overcome the weight accorded the plaintiff's choice of forum, this court must resolve all doubts against removal with the appropriate remedy being remand to state court. *See, e.g., Shamrock Oil and Gas Corporation,* 313 U.S. at 108–09, 61 S.Ct. at 872; *Breymann v. Pennsylvania O. & D.R. Co.,* 38 F.2d 209, 212 (6th Cir.1930); *Wenger v. Western Reserve Life Assurance Company of Ohio,* 570 F.Supp. 8, 10–11 (M.D.Tenn. 1983). The court finds that USF & G has failed to meet this burden. The court would also note that no error can be predicated by this court's remanding the case to state court whereas, on the other hand, if jurisdiction is retained, this court may be in error by failing to remand and a final judgment rendered herein may be reversed on this ground alone.

*Conclusion*

In conclusion, the court finds that UT has provided ample constitutional, statutory and federal and state case law authority from Tennessee to support its position that UT is an arm, agency or *alter ego* of the State for diversity of citizenship purposes. At the very least, the authority relied on by UT has clearly prevented USF & G from carrying its burden of establishing the propriety of federal jurisdiction by convincing this court that UT is something other than an arm, agency or *alter ego* of the State of Tennessee for diversity of citizenship purposes. The court, therefore, is constrained to hold that it does not have subject matter jurisdiction over UT and must remand this case to the Circuit Court for Knox County, Tennessee for trial.

Order accordingly.